United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 5, 2005**

Charles R. Fulbruge III
Clerk

In the United States Court of Appeals

For the Fifth Circuit

_____

No. 04-20094
_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JOSE NARCISO ORELLANA,

Defendant - Appellant.


_____

Appeal from the United States District Court
For the Southern District of Texas
_____


Before HIGGINBOTHAM, SMITH, and BENAVIDES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Defendant Jose Narciso Orellana appeals the district court's final judgment of conviction sentencing him to eighteen months' imprisonment. Orellana was indicted under 18 U.S.C. § 922(g)(5)(A) for possessing a firearm while being an alien "illegally or unlawfully in the United States." Before trial, Orellana sought dismissal of his indictment on grounds that he was legally present on account of his temporary protected status. The district court denied this request, and Orellana was subsequently convicted at a bench trial. Because we conclude that it is uncertain whether Congress intended to criminalize the possession of firearms by

aliens in receipt of lawful temporary protected status, we apply the rule of lenity and reverse.

                                I

Orellana is a citizen of El Salvador.  He entered the United States without inspection at Douglas, Arizona, in February of 2000, and has continuously remained in the United States.  In March 2001, El Salvador suffered three severe earthquakes, substantially disrupting living conditions in the country.  In response to this disaster, the United States Attorney General exercised his authority under 8 U.S.C. § 1254a ("section 1254a") and designated El Salvador for protected status.[1]  By virtue of this designation, nationals of El Salvador may apply for temporary protected status ("TPS"), allowing them to remain in the United States and obtain employment until the country designation is lifted or their temporary protected status is withdrawn.

Upon learning of El Salvador's designation, Orellana filed a TPS application along with an application for an Employment Authorization Document.  In his TPS application, Orellana disclosed that he was present in the United States illegally.  Both of his applications were granted, and Orellana secured employment as an armed security guard for Bayou City Patrol Division, a Houston

---

[1] *See* Designation of El Salvador Under Temporary Protected Status Program, 66 Fed. Reg. 14,214 (March 9, 2001).

2

private security company.[2]

The owner of Bayou City Patrol, Manuel Rodriguez, accompanied Orellana to a local pawn shop where he purchased a Taurus 9mm caliber handgun for Orellana's use in his role as a security guard. Using a Social Security Number that was not his own, Orellana obtained a Texas Commissioned Security Officer Card issued by the State of Texas and required to be presented to law enforcement officers upon request by all armed security guards. Orellana then obtained a valid Social Security Number from the Bureau of Immigration and Customs Enforcement, but failed to change the number on file with the Texas Commission on Private Security.

On June 8, 2003, as a result of an ongoing investigation of private security firms employing and arming illegal aliens as security guards in the Houston area, federal and local law enforcement agents encountered Orellana while he was working outside a Houston nightclub. He was carrying his Taurus 9mm handgun, and upon demand presented his Texas Commissioned Security Officer Card. The agents took Orellana into custody. After waiving his constitutional rights, Orellana admitted that he had entered the United States illegally, and that he had obtained his Commissioned Security Officer Card using a false Social Security Number. Orellana also informed the agents that he had obtained an Employment Authorization Document and had been granted TPS as a

---

[2] It is unclear from the record whether Orellana's applications were approved before or after he secured this employment.

citizen of El Salvador.

Orellana was indicted under 18 U.S.C. § 922(g)(5)(A) ("section 922(g)(5)(A)") for being an alien illegally or unlawfully in the United States in possession of a firearm.  Orellana filed a motion to dismiss the indictment on grounds that he was not present in the United States illegally or unlawfully as he had been granted TPS. The district court denied Orellana's motion to dismiss, finding that his TPS registration did not alter his status as an illegal immigrant.  After a bench trial, Orellana was found guilty and sentenced to eighteen-months' imprisonment followed by a three-year term of supervised release.  He filed a timely notice of appeal.

## II

The sole question we must address in this appeal is whether an alien who enters the United States without inspection and subsequently receives TPS is "illegally or unlawfully in the United States" under section 922(g)(5)(A).  Orellana argues that the district court erred in failing to dismiss his indictment because he was legally and lawfully present in the United States at the time alleged in his indictment as a result of his temporary protected status.  The Government dismisses this argument, contending that TPS confers nothing more than a temporary stay of removal and has no impact upon the legality of an alien's presence in the United States.

We address these contentions by first looking to the nature of the benefits conferred upon an alien who receives TPS.  We then

4

turn to consider whether receipt of TPS renders an alien's presence legal for purposes of section 922(g)(5)(A).

A

We begin by looking to the TPS statute to determine the nature and effect of TPS upon a recipient alien.[3] Congress first made TPS available via the Immigration Act of 1990[4] in response to the problem posed by the presence of aliens from "countries experiencing apparently temporary disruptions creating situations in which providing temporary refuge in the United States was an appropriate policy."[5]

In order for an alien to be eligible for TPS, the alien must first be a national of a foreign state "designated" by the Attorney General.[6] A foreign state may be designated only if certain conditions are present which, in general, prevent nationals of that state from returning in safety.[7] In order to qualify for TPS, an alien who is a national of a designated foreign state must (1) be continuously present in the United States since the effective date of the most recent designation of that state; (2) continuously

---

[3] We note at the outset that the Government does not dispute that Orellana was properly registered for TPS at the time of his arrest.

[4] Pub. L. No. 101-649, 104 Stat. 4978.

[5] RICHARD D. STEEL, IMMIGRATION LAW § 8:16 (2d ed. 2002).

[6] 8 U.S.C. § 1254a(a)(1)

[7] These conditions include ongoing armed conflict within the state, natural disasters such as earthquakes or floods, and other "extraordinary and temporary conditions." *See* 8 U.S.C. § 1254a(b)(1)(A)-(C).

5

reside in the United States from the date that the Attorney General designates; (3) be admissible as an immigrant, subject to certain exceptions; and (4) register during an appropriate registration period.[8] An otherwise qualified alien will be ineligible for TPS if the alien has committed a felony or two misdemeanors in the United States, or is ineligible for asylum under 8 U.S.C. § 1158(b)(2)(A).[9]

An alien whose TPS application is approved receives a number of important benefits. First, the alien may not be removed from the United States so long as the registration is in effect.[10] Second, the alien may seek authorization to engage in employment.[11] Third, the alien may travel abroad with the prior consent of the

---

[8] 8 U.S.C. § 1254a(c)(1)(A)(i)-(iv). Technically, Orellana was not eligible for TPS because he had entered the country without inspection and was inadmissible at the time of his application. *See* 8 U.S.C. § 1254a(c)(1)(A)(ii). However, Orellana disclosed his illegal entry on his TPS application, and this application was subsequently granted. This raises an inference that Orellana's inadmissibility was waived by the Attorney General. *See* 8 U.S.C. § 1254a(c)(2)(A)(ii) ("[E]xcept as provided in clause (iii), the Attorney General may waive any other provision of section 1182(a) of this title in the case of individual aliens for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest[.]").

[9] 8 U.S.C. § 1254a(c)(2)(B). An alien will be ineligible for asylum if the Attorney General determines that, *inter alia*, (1) the alien has somehow participated in the persecution of a person based on race, religion, nationality, membership in a social group, or political opinion; (2) the alien has been convicted by final judgment of a "particularly serious crime" and constitutes a danger to the people of the United States; (3) there are serious grounds for believing that the alien committed a serious nonpolitical crime outside the United States prior to the alien's arrival; and (4) there are reasonable grounds for regarding the alien as a danger to U.S. security. 8 U.S.C. § 1158(b)(2)(A)(i)-(iv).

[10] *See* 8 U.S.C. § 1254a(a)(1)(A).

[11] *See* 8 U.S.C. § 1254a(a)(1)(B).

Attorney General.[12] Fourth, the alien is considered to be in lawful immigration status as a non-immigrant for purposes of adjustment of status under 8 U.S.C. §§ 1255, 1258.[13]

These benefits are tempered, however, in several ways. TPS may be withdrawn if the Attorney General finds that a registered alien is statutorily ineligible, the alien fails to maintain continuous physical presence in the United States subject to certain exceptions, or the alien fails to register at the end of each twelve-month period following his initial receipt of TPS.[14] Furthermore, as a practical matter, TPS registration necessarily discloses an otherwise illegal alien's whereabouts, facilitating removal if the alien is later determined ineligible or has his status withdrawn.[15]

The Attorney General is required to provide all TPS recipients with information concerning their status.[16] Specifically, an alien must be provided with a registration document and a notice that lists the benefits of TPS and informs the alien that failure to maintain TPS eligibility and register annually will result in withdrawal of TPS and possible deportation.[17]

---

[12] *See* 8 U.S.C. § 1254a(f)(3).

[13] *See* 8 U.S.C. § 1254a(f)(4).

[14] *See* 8 U.S.C. § 1254a(c)(3)(A)-(C).

[15] *See* STEEL, *supra* note 5, § 8:16.

[16] 8 U.S.C. § 1254a(a)(3)(A).

[17] 8 C.F.R. § 244.10(f)(1), (2)(i)-(v), (4)(i)-(iii) (2004).

An alien registered for TPS is not required to surrender non-immigrant or any other status that he may previously have been granted, and may acquire non-immigrant status if he has not already done so.[18]  In addition, while registered for TPS an alien may not "be detained by the Attorney General on the basis of the alien's immigration status in the United States."[19]  When the Attorney General terminates a country's TPS designation, registered nationals of that country return to the same immigration status they maintained before TPS, provided such status has not expired or been terminated, or to any other status they may have been granted while registered for TPS.[20]

Although few courts have discussed the effect of TPS upon the legality of an alien's presence in the United States, those that have done so have generally found that TPS renders an alien's presence lawful.[21]  In addition, aliens with TPS are considered to

---

[18] 8 U.S.C. § 1254a(a)(5).

[19] 8 U.S.C. § 1254a(d)(4).

[20] *See* 66 Fed. Reg. at 14,214.

[21] *See Okpa v. INS*, 266 F.3d 313, 315 (4th Cir. 2001) ("TPS allows an alien to remain in the United States legally . . . ."); *Equal Access Educ. v. Merten*, 305 F. Supp. 2d 585, 597 (E.D. Va. 2004) (finding that an alien who enjoys TPS is "not unlawfully present in the United States," and "currently resides in the United States legally"); *League of United Latin Am. Citizens v. Wilson*, 908 F. Supp. 755, 778 (C.D. Cal. 1995) (describing TPS as a category of "lawful immigration status"); *but see Saccoh v. INS*, 24 F. Supp. 2d 406, 407 (E.D. Pa. 1998) (finding that an alien whose request for extension of voluntary departure was denied was unlawfully present but protected from removal under TPS).

be in a "valid status" for purposes of applying for asylum,[22] and to be "lawfully present in the United States" for purposes of applying for Title II Social Security benefits.[23]  However, aliens with TPS are not considered to be "permanently residing in the United States under color of law,"[24] precluding their receipt of such things as unemployment and SSI benefits.[25]

In summary, aliens who apply for and receive TPS are allowed to remain in the United States and work, provided that they register annually and their country of nationality remains designated.  They are ineligible for most public assistance programs, but are allowed to apply for adjustment of status as if they possessed lawful non-immigrant status.  While registered for TPS, an alien maintains any pre-existing immigration status he previously obtained, and may acquire a new immigration status. Once TPS is withdrawn, an alien reverts to any immigration status that he maintained or was granted while registered for TPS.

B

We now consider whether an alien's receipt of TPS renders his

---

[22] *See* 8 C.F.R. § 208.14(c)(2) (2004).  TPS itself is described by the U.S. Citizenship and Immigration Service as a valid form of "temporary immigration status granted to eligible nationals of designated countries (or parts thereof)." *See* U.S. Citizenship and Immigration Services, What is Temporary Protected Status?, *at* http://uscis.gov/graphics/services/tps_inter.htm#whatistps (last visited March 25, 2005).

[23] *See* 8 C.F.R. § 103.12(a)(4)(ii) (2004).

[24] 8 U.S.C. § 1254a(f)(1).

[25] *See* 26 U.S.C. § 3304(a)(14)(A); 20 C.F.R. § 416.1619 (2004); *see generally* 20 C.F.R. § 416.1618 (2004).

presence in the United States lawful under section 922(g)(5)(A). We review this question of statutory interpretation *de novo*.[26]

When interpreting a statute, we begin with "the language of the statute itself."[27] We follow the "plain and unambiguous meaning of the statutory language," interpreting undefined terms according to their ordinary and natural meaning and the overall policies and objectives of the statute.[28] If the statute is ambiguous, we may look to the legislative history or agency interpretations for guidance.[29]

Section 922(g)(5)(A) provides: "It shall be unlawful for any person . . . who, being an alien . . . is illegally or unlawfully in the United States . . . [to] possess in or affecting commerce, any firearm of ammunition . . . ."[30] The words "illegally" and "unlawfully" are not statutorily defined, and must therefore be given their ordinary and natural meaning. We have observed that "[d]ictionaries are a principal source for ascertaining the

---

[26] *See See Rogers v. San Antonio*, 392 F.3d 758, 761 (5th Cir. 2004); *United States v. Banks*, 339 F.3d 267, 269 (5th Cir. 2003) ("A challenge to an indictment based on the legal sufficiency of uncontested facts is an issue of law reviewed *de novo*.").

[27] *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980).

[28] *United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004) (quoting *Salinas v. United States*, 522 U.S. 52, 57 (1997)) (citation and internal quotation marks omitted).

[29] *Id.*

[30] 18 U.S.C. § 922(g)(5)(A).

10

ordinary meaning of statutory language[.]"[31] Black's Law Dictionary defines "illegal" as "[f]orbidden by law; unlawful,"[32] and defines "unlawful" as "[n]ot authorized by law; illegal."[33] Webster's Collegiate Dictionary defines "illegal" as "not according to or authorized by law,"[34] and "unlawful" as "not lawful; not morally right or conventional."[35] Read within the context of section 922(g)(5)(A), these definitions indicate that an alien "illegally or unlawfully in the United States" is an alien whose presence within the United States is forbidden or not authorized by law.[36]

Here, Orellana entered the country without inspection, making his initial presence unlawful. However, he subsequently applied for and was granted TPS. As a result, Orellana was granted protection from removal, authorized to seek employment, and given the ability to apply for adjustment of status as if he were in lawful non-immigrant status. While it is true that upon withdrawal of TPS, Orellana would "revert" to his original illegal immigration

---

[31] *Thompson v. Goetzmann*, 337 F.3d 489, 497 n.20 (5th Cir. 2003).

[32] BLACK'S LAW DICTIONARY 763 (8th ed. 2004).

[33] *Id.* at 1574.

[34] MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 577 (10th ed. 1993).

[35] *Id.* at 1294.

[36] This definition is consistent with our description of an illegal alien as one who is "in the United States without authorization." *United States v. Igbatayo*, 764 F.2d 1039, 1040 (5th Cir. 1985). In *Igbatayo*, we held that an alien who entered the United States on student non-immigrant status and subsequently failed to maintain his status as a student as required by his visa was "in the same position legally as the alien who wades across the Rio Grande or otherwise enters the United States without permission." *Id.*

11

status, he was in a form of lawful status throughout the time his TPS registration was effective. Thus, the plain language of section 922(g)(5)(A) provides support for the proposition that his presence in the United States was lawful at the time alleged in his indictment. At the very least, it does not unambiguously indicate that his presence was unlawful.

Turning to the overall structure of 18 U.S.C. § 922 for additional guidance, we find that it sets forth many restrictions upon the possession, sale, delivery, shipment, transportation, or transfer of firearms by specific persons. In particular, section 922(g) criminalizes the possession or receipt of firearms transported or shipped in interstate commerce by certain categories of persons, including convicted felons, fugitives from justice, unlawful users of controlled substances, persons adjudicated mentally defective, persons dishonorably discharged from the Armed Forces, persons who have renounced their United States citizenship, persons subject to certain restraining orders, and persons convicted of misdemeanor crimes of domestic violence.[37] In addition to these categories, section 922(g)(5)(B)[38] prohibits aliens admitted under certain non-immigrant visas from possessing firearms

---

[37] 18 U.S.C. § 922(g)(1)-(4), (6)-(9).

[38] This section was added by Congress in 1998. *See* Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, § 101(b), 112 Stat. 2681 (1998).

12

without a waiver from the Government.[39] These provisions demonstrate that the objective of section 922(g) is to prohibit persons within specifically defined groups from possessing, receiving, or transporting firearms. Moreover, the specific types of groups selected for disqualification indicate that the purpose of the statute is that of keeping firearms out of the hands of those typically considered dangerous or irresponsible.

This understanding of the purpose of section 922(g)(5)(A) is reinforced by examining the statute's legislative history. Section 922(g)(5)(A) had its origins in Title VII of the Omnibus Crime Control and Safe Streets Act of 1968,[40] as amended by the Gun Control Act of 1968.[41] The Crime Control and Safe Streets Act "started its life as a measure designed to aid state and local governments in law enforcement by means of financial and administrative assistance."[42] Title VII of the Act, introduced as a floor amendment by Senator Russell Long from Louisiana, was "hastily passed, with little discussion, no hearings and no report."[43]

Title VII criminalized the receipt, possession or

---

[39] *See* 18 U.S.C. § 922(g)(5)(B), (y)(3).

[40] Pub. L. No. 90-351, 82 Stat. 197 (1968).

[41] Pub. L. No. 90-618, 82 Stat. 1231 (1968).

[42] *United States v. Bass*, 404 U.S. 336, 344 n.11 (1971).

[43] *Id.* at 344.

13

transportation of a firearm in or affecting interstate commerce by various persons, including convicted felons, mental incompetents, and "alien[s] . . . illegally or unlawfully in the United States."[44] Senator Long indicated that his introduction of Title VII was motivated by the rise of political assassinations and violence in the United States,[45] and his desire to keep firearms away from likely perpetrators.[46] Senator Joseph Tydings reiterated this concern, noting that the broad purpose of the 1968 Act was "to make it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency."[47] Echoing Senator Tydings' remarks, Congressman Emanuel Celler, the House Manager of the Act, stated that the "bill seeks to maximize the possibility of keeping firearms out of the hands of such persons" as "drug addicts, mental incompetents,

---

[44] 18 U.S.C. App. § 1202(a)(5), *repealed by* Firearm Owner's Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (May 19, 1986).

[45] *See Lewis v. United States*, 445 U.S. 55, 63 (1980) ("It is not without significance, furthermore, that Title VII, as well Title IV of the Omnibus Act, was enacted in response to the precipitous rise in political assassinations, riots, and other violent crimes involving firearms, that occurred in this country in the 1960's."); *Bass*, 404 U.S. at 345 ("On the Senate floor, Senator Long, who introduced s 1202, described various evils that prompted his statute . . . [including] assassinations of public figures and threats to the operation of businesses significant enough in the aggregate to affect commerce.").

[46] 114 Cong. Rec. 14,773-74 (1968) ("[U]nder Title VII, every citizen could possess a gun until the commission of his first felony. Upon his conviction, however, Title VII would deny every assassin, murderer, thief and burglar of the right to possess a firearm in the future. . . . Despite all that has been said about the need for controlling firearms in this Country, no other amendment heretofore offered would get at the Oswalds or the Galts. They are the types of people at which Title VII is aimed.")

[47] S. Rep. No. 1501, at 22 (1968).

persons with a history of mental disturbances, and persons convicted of certain offenses . . . ."[48]

The U.S. Supreme Court has frequently cited to and expounded upon this legislative history when interpreting Title VII. In *Huddleston v. United States*, the Court noted that "[t]he principal purpose of the federal gun control legislation . . . was to curb crime by keeping 'firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'"[49] In *Barrett v. United States*, the Court declared that "[t]he very structure of the Gun Control Act demonstrates that Congress did not intend merely to restrict interstate sales but sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous."[50] In *Scarborough v. United States*, the Court observed that the "legislative history [of Title VII] . . . supports the view that Congress sought to rule broadly to keep guns out of the hands of those who have demonstrated that 'they may not be trusted to possess a firearm without becoming a threat to society.'"[51]

By including illegal aliens within the ambit of Title VII's prohibitions, Congress evidently believed that such aliens came

---

[48] 114 Cong. Rec. 21,784 (1968).

[49] 415 U.S. 814, 824 (1974) (quoting S. Rep. No. 1501, at 22 (1968)).

[50] 423 U.S. 212, 218 (1976).

[51] 431 U.S. 563, 573 (1977) (quoting 114 Cong. Rec. 14,773 (1968) (remarks of Senator Long)).

within the class of untrustworthy persons whose possession of firearms would constitute a threat to society. In upholding section 1202(a)(5), section 922(g)(5)(A)'s predecessor statute, against an equal protection challenge, the Second Circuit validated this proposition, noting that "[i]llegal aliens are aliens who have already violated a law of this country."[52] The court observed that illegal aliens are "likely to maintain no permanent address in this country, elude detection through an assumed identity, and--already living outside the law--resort to illegal activities to maintain a livelihood."[53]

Congress's decision to include illegal aliens within the categories of persons who are prohibited from possessing firearms does not necessarily indicate an intent to include within the prohibition aliens in receipt of TPS. Unlike illegal aliens who attempt to avoid detection, aliens registered for TPS have purposefully revealed their whereabouts to the government with the intent of receiving legal protection from deportation and authorization to seek employment. As a result, such aliens are not part of an underground population of persons who, unable to secure lawful employment, have a greater likelihood to engage in criminal conduct. Further, an alien's application for TPS will be denied if it is determined that the alien has committed a serious crime, or

---

[52] *United States v. Toner*, 728 F.2d 115, 128 (2d Cir. 1984).

[53] *Id.* at 128-29 (quoting *United States v. Toner*, No. CR82-377 (E.D.N.Y. May 17, 1983) (order denying motion to dismiss a portion of an indictment)).

16

otherwise represents a danger to the people of the United States.[54] Little in this structure signals a Congressional purpose of criminalizing firearm ownership by aliens present under a lawful status. Nor are we aided by the fact that the TPS statute was enacted long after the passage of the Gun Control Act.

The Government urges that we should look for guidance to a regulatory definition of section 922(g)(5)(A) promulgated by the Bureau of Alcohol, Tobacco and Firearms. This regulation provides in relevant part that "[a]liens who are unlawfully in the United States are not in valid immigrant, non-immigrant or parole status."[55] The regulation further provides that this "term includes any alien . . . [w]ho unlawfully entered the United States without inspection or authorization by an immigration officer and who has not been paroled into the United States under section 212(d)(5) of the Immigration and Nationality Act (INA)."[56] The Government argues that this regulation clearly provides that Orellana is illegally present as he entered without inspection and has not been paroled.

We decline the Government's invitation to afford weight to the ATF regulation for a number of reasons. First, the legal status of an alien who is granted TPS is uncertain. It is clear that an

---

[54] *See supra* note 9.

[55] 27 C.F.R. § 478.11 (2004).

[56] *Id.*

alien in receipt of TPS is in a valid status of some type.[57] The word "immigrant" in the regulation likely refers only to those aliens who are in lawful permanent residents.[58] However, "immigrant" is also used in the INA as a generic catchall word to refer to "any alien except one who is classified in one of the specified nonimmigrant categories."[59] That is, we do not know the breadth of the term from the regulation.

Second, although some deference is due an agency's interpretation of a criminal statute,[60] the level of deference due an agency's interpretation of a statute imposing criminal liability is uncertain, particularly when the promulgating agency lacks expertise in the subject matter being interpreted.[61] While the ATF was delegated authority to implement section 922(g),[62] its field of expertise lies outside the realm of immigration law. Further,

---

[57] *See supra* note 21 and accompanying text.

[58] *See* STEEL, *supra* note 5, § 2:24 ("The terms or concepts immigrant, permanent resident, permanent resident alien, 'green card' holder, or 'blue card' holder, are synonymous.").

[59] *Id.; see also* 8 U.S.C. § 1101(a)(15) (listing the forms of valid non-immigrant status).

[60] *See Babbit v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 703 (1995) (agency regulation interpreting provisions of the Endangered Species Act imposing criminal liability entitled to "some degree of deference").

[61] *See Nat'l Labor Relations Bd. v. Okla. Fixture Co.*, 332 F.3d 1284, 1287 (10th Cir. 2003) (noting that it is "not entirely clear exactly how the *Chevron* analysis is affected by the presence of criminal liability in a statute being interpreted by an agency," and that deference may depend upon "considerations of the agency's particular expertise").

[62] *See* 18 U.S.C. § 926(a) (1994), *amended by* Homeland Security Act of 2002, Pub. L. No. 107-296, § 1112(f)(6), 116 Stat. 2135 (striking "Secretary" and inserting "Attorney General" throughout the statute).

given that the plain language and legislative history of section 922(g)(5)(A) lend support to the proposition that an alien who is granted TPS is legally present in the United States, affording conclusive weight to a questionable interpretation of an agency regulation cutting the opposite way for the purpose of imposing *criminal liability* is inappropriate.

Third, we note that in a recent case, the Government expressed reservations as to whether the ATF regulation as a whole is entitled to any level of deference whatsoever.[63]  Taken together, these considerations militate against affording the ATF regulation dispositive weight in the present case.

We are also directed to our court's recent decision in *United States v. Flores*[64] holding that an alien who has received temporary benefits on account of his *application* for TPS is not lawfully present for purposes of section 922(g)(5)(A).  In *Flores*, we found that an alien's receipt of such temporary benefits as protection from removal and authorization to seek employment did not render him immune to prosecution under section 922(g)(5)(A) when he had entered the country illegally and had not received a valid form of

---

[63] *See United States v. Gayle*, 342 F.3d 89, 93 n.4 (2d Cir. 2004) ("We requested briefing from [the Government and the defendant] on the import of [27 C.F.R. § 478.11], and both parties agreed that ATF's interpretation of a criminal statute is not entitled to deference under *Chevron* . . . even if the statute were ambiguous.").

[64] No. 04-20109, 2005 WL 603073 (5th Cir. March 16, 2005).

immigration status.[65]

We find this decision unassailably correct. Receipt of temporary benefits such as employment authorization or a temporary stay of removal does not render an otherwise illegal alien's presence lawful.[66] Here, however, we are not dealing solely with the temporary extension of benefits pending an administrative ruling upon an application; rather, we are faced with an alien who was actually granted TPS. Unlike an applicant for TPS, whose benefits are limited to protection from removal and temporary work authorization,[67] an alien whose application for TPS is granted also receives the privileges of applying for adjustment of status and of traveling abroad with prior consent.[68] Importantly, an alien in receipt of TPS is in lawful status, whereas an alien who has merely been extended temporary benefits awaiting the disposition of his application for lawful status may be (and often is) in an unlawful immigration status. We find these differences not without significance, and therefore decline to extend our holding in *Flores* to the facts of this case.

Turning to the balance of cases addressing the legality of an

---

[65] *Id.* at *4-*5.

[66] *See Hussein v. INS*, 61 F.3d 377, 381 (5th Cir. 1995) (holding that a temporary stay of removal did not change an alien's previous illegal status into a legal status); *United States v. Bazargan*, 992 F.2d 844, 848-49 (8th Cir. 1993) (holding that an alien was illegally present under section 922(g)(5)(A) despite his receipt of employment authorization).

[67] *See* 8 C.F.R. § 244.10(e)(i)-(ii) (2004).

[68] *See* 8 U.S.C. § 1254a(f)(3)-(4); 8 C.F.R. § 244.10(f) (2004).

alien's presence pursuant to section 922(g)(5)(A), we find no authority for the proposition that an alien who has acquired a valid status is "illegally" or "unlawfully" present in the United States. Rather, we find that these cases deal exclusively with scenarios in which an alien has been extended benefits pending the outcome of his or her application for valid status, or lacks any status whatsoever.[69]

### III

Given the ambiguity of section 922(g)(5)(A), the questionable interpretation and weight of the ATF regulation, and the absence of binding case law on point, we are constrained to apply the rule of lenity in this case. The rule of lenity provides that "when [a] choice must be made between two readings of what conduct Congress has made a crime, it is appropriate, before choosing the harsher alternative, to require that Congress should have spoken in language that is clear and definite."[70] The policy underlying the

---

[69] *See, e.g.*, *United States v. Atandi*, 376 F.3d 1186, 1188 (10th Cir. 2004) (alien whose wife had filed an I-130 petition on his behalf but who had neglected to file an application for adjustment of status was illegally present); *United States v. Hernandez*, 913 F.2d 1506, 1513 (10th Cir. 1990) (alien who entered illegally was illegally present when he acquired a handgun prior to filing his application for amnesty); *United States v. Garcia*, 875 F.2d 257, 257-58 (9th Cir. 1989) (illegal alien not entitled to jury instruction that he was legally present if the jury found that the INS was aware of his presence and consented to it); *Igbatayo*, 764 F.2d at 1040 (alien whose non-immigrant student status had expired was present illegally); *United States v. Revuelta*, 109 F. Supp. 2d 1170, 1174-77 (N.D. Cal. 2000) (alien whose wife had filed an I-130 petition on his behalf but who was not yet eligible to file an application for adjustment of status was illegally present); *United States v. Brissett*, 720 F. Supp. 90, 90 (S.D. Tex. 1989) (alien whose visitor's visa had expired was legally present when he was in the process of seeking adjustment of status to lawful permanent resident).

[70] *Jones v. United States*, 529 U.S. 848, 849-50 (2000) (citing *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221-22 (1952)).

21

rule of lenity is that of fairness to the accused:

> Although it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear.[71]

The rule of lenity should not be applied haphazardly, however, but should be reserved "for those situations in which a reasonable doubt persists about a statute's intended scope even *after* resort to 'the language and structure, legislative history, and motivating policies' of the statute."[72] Consequently, we will resort to the rule of lenity only "if the text of a statute is opaque or ambiguous."[73] "The rule-of-lenity is a rule of statutory construction," and should be employed only after other canons of construction have proven unsatisfactory in pursuit of a criminal statute's meaning.[74]

After conscientiously applying our circuit's rules of statutory construction, we cannot say with certainty that Congress intended to criminalize the possession of firearms by aliens who

---

[71] *McBoyle v. United States*, 283 U.S. 25, 27 (1931) (Holmes, J.).

[72] *Moskal v. United States*, 498 U.S. 103, 108 (1990) (quoting *Bifulco v. United States*, 447 U.S. 381, 387 (1980)); *see also United States v. Reedy*, 304 F.3d 358, 368 n.13 (5th Cir. 2002) ("Despite its status as a tool of last resort, [the rule of lenity] has a long and established history in the Supreme Court and this circuit. Where, after seizing everything from which aid can be derived, the statute remains ambiguous, the rule of lenity may be applied.").

[73] *Administaff Cos. v. N.Y. Joint Bd., Shirt & Leisurewear Div.*, 337 F.3d 454, 457 (5th Cir. 2003).

[74] *United States v. Rivera*, 265 F.3d 310, 312 (5th Cir. 2001).

have been granted temporary protected status. It may be sound policy, but as such its wisdom has no call upon the judicial power. When Congress does unambiguously render conduct illegal through appropriate legislation, it is not our task to offer supplementary and clarifying amendments.

## IV

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND with instructions to dismiss Orellana's indictment.