RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0157p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

FRANIKA FONSHEA FLORES, et al.,

*Plaintiffs*,

No. 12-3549

STACEY LEIGH SUAZO and SAADY SUAZO
CALIX,

*Plaintiffs-Appellants*,

*v.*

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES, ALEJANDRO
MAYORKAS, MARK HANSEN, JANET
NAPOLITANO, ERIC H. HOLDER, JR., Attorney
General, and STEVEN M. DETTELBACH,
*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:11-cv-00642—Solomon Oliver, Jr., Chief District Judge.

Argued: March 14, 2013

Decided and Filed: June 4, 2013

Before: KEITH, MARTIN, and COLE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Abraham Kay, Cleveland, Ohio, for Appellants. James R. Bennett II, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellees. **ON BRIEF:** Abraham Kay, Cleveland, Ohio, for Appellants. Kathleen L. Midian, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellees.

1

————————————

**OPINION**

————————————

DAMON J. KEITH, Circuit Judge.  This case illustrates the archaic and convoluted state of our current immigration system.  While many suggest that immigrants should simply "get in line" and pursue a legal pathway to citizenship, for Saady Suazo and other similarly situated Temporary Protected Status beneficiaries, the Government proposes that there is simply no line available for them to join.  The law does not support such a conclusion in this case.

Appellants are Mr. and Mrs. Suazo.  The are married and raising a minor child together in the United States.  Mr. Suazo is a citizen of Honduras, but has been in the United States for about fifteen years.  He was granted temporary protected status by the Attorney General, which has allowed him to work and live legally in the United States as a protected individual since 1999.  After their marriage, the couple sought to obtain lawful permanent resident status for Mr. Suazo.  They were unsuccessful before the U.S. Citizenship and Immigration Services ("USCIS") and thus filed the present action in federal district court.

The Suazos appeal the district court's dismissal of their claims under the Administrative Procedures Act and the Mandamus Act.  On appeal the parties dispute whether 8 U.S.C. § 1254a(f)(4), a subsection of the temporary protected status statute, provides a pathway for Mr. Suazo to obtain lawful permanent resident status pursuant to 8 U.S.C. § 1255, the adjustment of status statute.  For the reasons that follow, we reverse the district court's judgment and remand the case to the USCIS for further proceedings with respect to the Administrative Procedure Act claim and decline to address the mandamus claim at this stage.

Saady Suazo is a Honduran immigrant.  He entered the United States without inspection on or about March 15, 1998.  He has been in the United States continuously

since that time. On September 3, 1999, Suazo was granted Temporary Protected Status ("TPS") due to his Honduran citizenship. His TPS designation has been continuously renewed since then due to his continued good moral character. As of this writing, his TPS designation has been renewed until July 5, 2013, but could potentially be discontinued anytime without notice.

On August 5, 2010, Saady Suazo married Stacey Leigh Suazo. On September 10, 2010, Stacey Suazo filed an Immediate Relative I-130 Petition on behalf of her husband, Saady Suazo. The same day, Saady Suazo filed an accompanying I-485 Application for Adjustment of Status form, seeking to become a Lawful Permanent Resident ("LPR") of the United States pursuant to 8 U.S.C. § 1255. The Suazos had an interview with immigration officials on November 29, 2010 at the USCIS Cleveland District Office. Mrs. Suazo's I-130 Petition for Mr. Suazo was approved—providing him with an independent basis to become an LPR. Mr. Suazo's LPR Application, however, was denied on December 21, 2010. The stated reason for the denial was that Mr. Suazo "entered the United States without inspection" on March 15, 1998.

Following the USCIS's denial of Mr. Suazo's LPR Application, Mr. and Mrs. Suazo filed a complaint in district court for declaratory judgment under the Administrative Procedures Act ("APA") and for mandamus relief. The Suazos argued that the USCIS wrongfully denied Mr. Suazo's LPR application. They argued for the district court to assume jurisdiction over the case and approve the LPR application. The Suazos argued below, and argue now, that Mr. Suazo's TPS status under 8 U.S.C. § 1254a(b)(1) makes him eligible to adjust to LPR status pursuant to 8 U.S.C. § 1255.

USCIS filed a motion to dismiss for failure to state a claim upon which relief can be granted and for lack of subject matter jurisdiction. The Suazos opposed the motion. Nevertheless, the district court granted the Government's motion to dismiss. The district court held that it lacked jurisdiction under the Mandamus Act because the Suazos had an adequate remedy under the APA. It further held that the Suazo's failed to state a claim under the APA. The district court reasoned that the plain language of 8 U.S.C.

§ 1255—the adjustment of status statute—precludes a TPS beneficiary who was not initially "inspected and admitted or paroled" into the United States, as a matter of law, from adjusting his status to LPR. The district court largely deferred to the Government's interpretation of the Immigration and Nationality Act of 1952 ("INA"), 8 U.S.C. §§ 1101–1537. The Suazos filed this timely appeal.

This Court reviews a district court's Federal Rule of Civil Procedure 12(b)(6) dismissal of a complaint for failure to state a claim *de novo*. *Brown v. Cassens Transp. Co.*, 675 F.3d 946, 952 (6th Cir. 2012). Conclusions of law are also subject to *de novo* review by this Court. *Dicicco v. U.S. Dep't. of Justice INS*, 873 F.2d 910, 913 (6th Cir. 1989).

We review Appellants' APA claim and consider whether § 1254a(f)(4) of the TPS statute provides a path to LPR status under the adjustment of status statute, § 1255. Appellants argue that the plain language of the statutes allows for a path to LPR status, otherwise there would be absurd results, as is apparent in the instant case. The Government's position was adopted by the district court—that there is no pathway to citizenship for Mr. Suazo while he is in the United States as a TPS beneficiary.

Under the APA, courts may review an agency's interpretation of a statute. 5 U.S.C. § 706. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984); *Nat'l Cotton Council of Am. v. U.S. EPA*, 553 F.3d 927, 933 (6th Cir. 2009). In determining if the intent is clear, courts consider "the language [of the statute] itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Nat'l Cotton Council of Am.*, 553 F.3d at 935 (internal quotation and citation omitted).

If the statute is found to be silent or ambiguous, and there is an agency interpretation that does not constitute the exercise of the agency's formal rule-making authority, courts may defer to an agency interpretation, even when the agency is not

exercising its formal rule-making authority. *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40 (1944). The weight of deference, if so given, depends on "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* at 140.

The plain language of the statute answers the question before the Court. Both parties agree that § 1255, which has to do with adjustment of status from nonimmigrant to LPR status, contains three requirements, two of which Mr. Suazo unquestionably satisfies. First, he has made an application for adjustment of status and second, an immigrant visa is immediately available through his American citizen wife. The parties disagree, however, as to the meaning of § 1255(a) which reads "the status of an alien who was inspected and admitted or paroled" may be adjusted in the Attorney General's discretion and also § 1255(a)(2), which states that an "alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence."[1] § 1255(a).

USCIS argues that Mr. Suazo and other TPS beneficiaries who initially entered the United States without inspection and have an independent basis for a visa can never satisfy the threshold requirement of being "admitted or paroled" or "admissible." The USCIS argues that Suazo is only allowed protection under TPS as long as the designation is conferred upon him. USCIS argues that he is unable to adjust to LPR under the independent basis—through his wife's application—because he was not admitted. The Government argues that he would essentially have to leave the United States and his family, risk his safety even though the Government has deemed him worthy of protected status, take a chance at not being readmitted to the United States, reapply on an independent basis to become an LPR, and then hope that he would finally

---

[1] We recognize that using the term "alien" to refer to other human beings is offensive and demeaning. We do not condone the use of the term and urge Congress to eliminate it from the U.S. Code. We use it here, however, to be consistent with the statutory language and to avoid any confusion in replacing a legal term of art with a more appropriate term.

be allowed to become an LPR in a country to which he has spent fifteen years contributing.

The Suazos, however, argue that the plain language, when considering the "language itself, the specific context in which the language is used, and the broader context of the statute as a whole," shows that Congress's clear intent was that a TPS beneficiary is afforded with a pathway to LPR status. The Suazos agree that one must be "admitted" or "admissible." However, they argue that TPS beneficiaries are afforded with an exception under the TPS statute which operates as an inadmissibility waiver. *See* § 1254a(f). We agree.

In this case, Mr. Suazo seeks to adjust his status to that of LPR. Section 1255 of Title 8 of the U.S. Code authorizes the Attorney General to adjust the

> status of an alien who was inspected and admitted or paroled into the United States . . . if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

8 U.S.C. § 1255(a).[2] Additionally, aliens other than immediate relatives, among some other categories, are barred from becoming LPRs if they

> continue[] in or accept[] unauthorized employment prior to filing an application for adjustment of status or . . . fail[] (other than through no fault of [their] own or for technical reasons) to maintain continuously a lawful status since entry into the United States . . . .

*Id.* at § 1255(c)(2).

Currently, Mr. Suazo is legally in the United States under TPS. Under the TPS statute, the Attorney General may grant temporary protected status to a national of a foreign state in designated cases of ongoing armed conflict, environmental disaster, or

---

[2]As noted above, the parties agree that Mr. Suazo has satisfied element (1) because he has submitted an LPR application and that he also satisfied element (3) because Mrs. Suazo's immediate relative visa petition has been approved.

other extraordinary and temporary conditions that prevent safe return. 8 U.S.C. § 1254a(b)(1). If eligible for TPS, such individuals are not subject to removal "from the United States during the period in which such status is in effect." § 1254a(1)(A). A TPS beneficiary may "engage in employment in the United States" as well, as Suazo has. § 1254a(1)(B). Suazo has available to him a basis for LPR status, through his wife's immediate relative petition. The only thing preventing Suazo from adjusting to LPR is the Government's interpretation of the interplay between the adjustment of status statute, § 1255, and one of the subsections of the TPS statute, § 1254a(f)(4). The plain language of the statutes leads us to our conclusion.

The TPS statute details the "[b]enefits and status during [the] period of temporary protected status." § 1254a(f). Subsection (f) begins by stating, "During a period in which an alien is granted temporary protected status[,] . . . for purposes of adjustment of status under section 1255 of this title and change of status under section 1258 of this title, the alien shall be considered as being in, and maintaining, lawful status as a nonimmigrant." § 1254a(f)(4). We interpret the statute exactly as written—as allowing Suazo to be considered as being in lawful status as a nonimmigrant for purposes of adjustment of status under § 1255.

We are unpersuaded by the Government's argument that the statement in § 1254a(f) regarding status as a lawful nonimmigrant pertains only to § 1255(c)(2)—a subsection of the adjustment of status statute that precludes adjustment of status to LPR if an immigrant works without authorization in this country. The Government argues that because TPS beneficiaries are allowed to work as part of the TPS program, the language in § 1254a(f) only exempts them from the work authorization issue in § 1255(c)(2). The Government has no support, other than the history of consistent and incorrect agency interpretations, regarding this issue.

The Government's interpretation of § 1254a(f) is unduly narrow and ignores the plain language of the statute. We see no reason why Congress would have written the exception in § 1254a(f) the way it did if it actually has to do only with § 1255(c)(2)—a

quite specific reference—rather than what the statute actually says, which is § "1255." Under the USCIS's interpretation, Congress also failed to reference any mention of work authorization or employment in § 1254a(4)(f). If Congress meant for the broadly written statement to apply to such a specific subsection, the USCIS has failed to explain how the plain language supports such a specific interpretation. The language of § 1254a is written as applying to § 1255, as a whole, and we interpret it as written. *See Milner v. Dep't of Navy*, 131 S. Ct. 1259, 1267 (2011) (reasoning that taking a red pen to a statute to "cut . . . out some [words]" and "past[e] in others" ignores the plain meaning of the statute) (internal citation omitted).

When considering the statutory scheme as a whole, the Suazos' interpretation has even more support from the plain language. The Government's argument that there is no authority to exercise discretion is contradicted by the statute itself. The TPS statute includes a section that states that the Attorney General may waive certain grounds of inadmissibility, such as in the case of "individual aliens for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest." § 1254a(c)(2)(A)(ii). While the statute grants discretion to the Attorney General, it also imposes limits on the Attorney General's discretion and states that the Attorney General has no discretion to waive the admissibility requirements for specific groups of people—certain criminals and former Nazis. § 1254a(c)(2)(A)(iii)(I–III). TPS beneficiaries are notably not named as one of the groups that is prohibited from discretionary relief. The TPS statute also defines the "[a]liens ineligible" for TPS protection, none of which apply to the Suazos. § 1254a(c)(2)(B). These two sections of the statutory scheme show in the plain language that Congress did not intend to strip the Attorney General of discretion to waive admissibility requirements for all TPS beneficiaries, especially those that are not specifically excluded in the statute.

Section 1182 of Title 8 of the United States Code also provides an extensive list of "[c]lasses of aliens ineligible for visas or admission." 8 U.S.C. § 1182. This list makes no mention of TPS beneficiaries being categorically barred from visa or admission eligibility. When considering the statutory scheme and the language of the

statutes, it is impossible to accept the USCIS's assertion that the plain language supports its position. An interpretation based on plain language does not require one to imply words and clauses to understand the meaning, nor does it require one to ignore other signs pointing to a logical and congruous interpretation. *CSX Transp., Inc. v. Alabama Dep't of Revenue*, 131 S. Ct. 1101, 1115–116 (2011) ("[S]tatutory interpretation focuses on the 'language itself, the specific context in which the language is used, and the broader context of the statute as a whole.'") (internal citation omitted).

Congress's apparent intent supports our interpretation of the statute as well. It is undisputed that a TPS beneficiary is a member of a class of people that Congress chose to protect due to an extraordinary circumstance. The Government notes that someone with TPS status cannot automatically become an LPR. The Government points to the fact that Congress has identified groups of immigrants who in fact are automatically given LPR status through acts such as the Cuban Refugee Adjustment Act, Pub. L. No. 89-732, 80 Stat. 1161 (1966) and the Haitian Refugee Immigration Fairness Act of 1998, Pub. L. No. 105-277, § 902, 112 Stat. 2681 (1998). The Government argues that if Congress wanted to allow TPS beneficiaries to become LPRs automatically, then the possibility of a special adjustment would be superfluous. The USCIS's argument is not on-point to the issue presented here. The issue is not whether all TPS beneficiaries automatically qualify for LPR adjustment under § 1255. Mr. Suazo argues that because he is a TPS beneficiary, who has been deemed to have good moral character and has a visa available to him on an independent basis—here through the immediate-relative petition filed by his wife—that he therefore qualifies for consideration of adjustment of status under § 1255. This is exactly what § 1254a(f)(4) provides because he is considered being in lawful nonimmigrant status and thus meets the three requirements in § 1255.[3]

---

[3]The parties dispute the relevance of the receipt of an I-94 Arrival-Departure record. Upon Mr. Suazo's conferral of TPS status, the USCIS issued to him an I-94 Arrival-Departure record. This is something that the USCIS does when one is afforded the initial grant of TPS. The document is a registration document that is normally issued to aliens only upon their admission, following inspection, to the United States. Under a standard "inspection" and "admission," the process only takes a few minutes. However, when receiving this form through TPS application, the process takes several months to complete, allowing the USCIS to more carefully review the case. The Suazos argue that TPS beneficiaries

Because our holding is based in the plain language of the statute, we need not accord deference to the agency interpretation offered by the Government. *Pub. Emps. Ret. Sys. v. Betts*, 492 U.S. 158, 171 (1989) ("[O]f course, no deference is due to agency interpretations at odds with the plain language of the statute itself."). Even if the statute had been silent or ambiguous, however, the USCIS interpretation would have been rejected. Under *Skidmore*, the weight of deference, if so given, depends on "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140. Here, there is no question that the consistency factor weighs in favor of the USCIS; the opinions from the agency are consistent with the USCIS position. For the reasons stated above, however, the "validity of reasoning" factor weighs heavily against the USCIS and outweighs the consistency factor. Being consistently wrong does not afford the agency more deference than having valid reasoning. The remaining factor—the thoroughness of the reasoning—does not militate strongly for either side. Again, incorrect reasoning, no matter how thorough, does not carry any weight. Any deference afforded would have been minimal, if at all.

The parties rely on two opinions that discuss the interplay between § 1255 and § 1254a from the Fifth and Eleventh Circuits: *United States v. Orellana*, 405 F.3d 360 (5th Cir. 2005) and *Serrano v. U.S. Attorney Gen.*, 655 F.3d 1260 (11th Cir. 2011). Neither case is binding on our court, and neither is particularly helpful in the instant case.[4]

experience the same, if not a more rigorous, I-94 process, which shows a consistency with admission procedure and thus supports his argument that he is able to adjust status to that of LPR. We decline to address the relevance of the issuance of the I-94 because the plain language of the statute answers the question before us.

[4] *Serrano* involved a situation superficially similar to the one presented here. In *Serrano*, the petitioner applied for TPS status, but did "not assert that he disclosed his illegal entry into the United States on his application for Temporary Protected Status." *Serrano*, 655 F.3d at 1265 n.4. Serrano was granted TPS status and later moved for adjustment of status under § 1255 when an immediate relative visa became available through his U.S. citizen wife. *Id.* at 1263. His LPR application was denied. The crucial difference in *Serrano* from the present case is that in *Serrano*, the petitioner did not disclose on his TPS application that he entered the country illegally, without inspection. Here, Suazo did.

*Orellana*, the Fifth Circuit case cited by the parties, involved the effect of TPS status on a

Policy considerations support our interpretation. Mr. Suazo seems to be the exact type of person that Congress would have in mind to allow adjustment of status from TPS beneficiary to LPR. He has been in the United States for about fifteen years. He has roots here. His wife and minor child are here. They are both United States citizens. He is of good moral character and a contributing member of society. He has waited his turn for an independent, legal, and legitimate pathway to citizenship, through the immediate relative visa application. If the statutes are interpreted as the Government argues they should be, the result would be absurd. The Government is essentially telling him that he is protected and can stay here, but that he will never be allowed to become an LPR, even for an independent basis. Under the Government's interpretation, Mr. Suazo would have to leave the United States, be readmitted, and then go through the immigration process all over again. This is simply a waste of energy, time, government resources, and will have negative effects on his family—United States citizens. We are disturbed by the Government's incessant and injudicious opposition in cases like this, where the only purpose seems to be a general policy of opposition for the sake of opposition.

Accordingly, we **REVERSE** the district court's judgment as to the APA claim and **REMAND** the case to the USCIS for review. Because we grant Petitioners' APA claim, we decline to address the mandamus claim.

---

criminal indictment for an illegal alien in the United States in possession of a firearm. *Orellana*, 405 F.3d at 361. The Fifth Circuit described Orellana's status as a TPS beneficiary and stated "[a]s a result, Orellana was granted protection from removal, authorized to seek employment, and given the ability to apply for adjustment of status as if he were in lawful non-immigrant status." *Id.* at 366. While the language is dicta, it gives insight into the Fifth Circuit's view of the issue. *Orellana* directly states that the statutory language and scheme supports the Suazos's view that there is a pathway for LPR status contained in these statutes.