United States Court of Appeals
Fifth Circuit

**F I L E D**

**October 12, 2005**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 04-20331

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

GILBERTO RUBIO LUCIO,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Texas

Before DAVIS, STEWART, and DENNIS, Circuit Judges.

CARL E. STEWART, Circuit Judge:

The difficult question presented in this matter lies at the nexus between criminal and immigration law. The United States appeals from the district court's grant of a judgment of acquittal following a jury's verdict which had found Gilberto Rubio Lucio ("Lucio") guilty of possession of a firearm while illegally or unlawfully present within the United States pursuant to 18 U.S.C. § 922(g)(5)(A). Lucio, an alien, had previously entered the country without authorization. He filed an application to adjust his immigration status to that of a lawful permanent resident. During the pendency of his application, he was authorized to work in the United States and deportation

proceedings could not be initiated. On this basis, the district court found that Lucio could not be charged with being illegally or unlawfully present within the United States given that he was "authorized" to remain in the county until the Immigration and Naturalization Service's (INS) adjudication of his application. We are constrained to hold that in light of recent precedent, if an alien's immigration status remains unlawful during the pendency of an application to adjust that status, the mere fact that he has received permission to work in the country, and may not be deported, does not alter the initial unlawfulness of his immigration status. Consequently, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2001, federal law enforcement officials began investigating security companies that had been employing illegal aliens as armed security guards for local Houston, Texas area businesses. On June 8, 2003, this investigation led the Bureau of Alcohol, Tobacco, and Firearms (ATF), along with other area law enforcement agencies to the "La Cucaracha" nightclub in Houston, where they encountered Lucio who was working as a security guard. Though Lucio did not have a firearm on his person when law enforcement personnel arrived at the nightclub, they learned that Lucio had discarded his weapon shortly before law enforcement's arrival. A subsequent consensual search of his vehicle recovered a loaded .38 caliber revolver.

Lucio was charged pursuant to § 922(g)(5)(A). The indictment provided that Lucio had illegally possessed the firearm on February 1, 2002.[1] He pled not guilty; a jury trial was held, and on December 3, 2003, a verdict of guilty was rendered. On January 9, 2004, Lucio moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, or in the alternative, a new

---

[1] During the trial it was learned that the weapon had been purchased by the roommate of Lucio on February 28, 1997, who then provided it to Lucio.

2

trial pursuant Federal Rule of Criminal Procedure 33. The basis for Lucio's motion was that because he had filed an application for adjustment of his immigration status, which was still pending at the time that he was charged with violating § 922(g)(5)(A), he could have been deemed to be illegally within the United States because he was lawfully permitted to remain in the country during the pendency of the application.[2] Significantly, among the privileges afforded to an individual who has applied for adjustment of status is that he is allowed to remain in the country while his application is pending. See Legal Immigration and Family Equity Act, Pub. L. No. 106-554, 114 Stat. 2763, Sec. 1104 (2000) (LIFE Act); see also 8 U.S.C. § 1255a(e). Consequently, he argued, the necessary predicate to be charged under § 922(g)(5)(A) was absent as he was not "illegally or unlawfully" present in the United States.

---

[2] In 1986, Congress enacted the Immigration Reform and Control Act (IRCA), which was intended to serve as an amnesty program, providing the opportunity for citizenship for aliens who had unlawfully lived in the United States continuously since prior to January 1, 1982. See 8 U.S.C. § 1255a(a)(2). The alien was required to have had continuous physical presence in the United States from the date that the IRCA was enacted–November 6, 1986. § 1255a(a)(3). The alien had to be admissible as an immigrant. § 1255a(a)(4). Moreover, in order to benefit from the amnesty statute, the alien was required to file an application for adjustment of status between May 5, 1987 and May 4, 1988. § 1255a(a)(1). Until a final determination is made as to the application for adjustment of status, the alien was permitted to work in the United States and deportation proceedings were temporarily stayed. § 1255a(e). Of note, the alien's temporary residence status could be revoked if, *inter alia*, he committed a felony. § 1255a(b)(2)(B).

On December 21, 2000, the Legal Immigration and Family Equity (LIFE) Act, Pub.L. No. 106-553, 114 Stat. 2762 and the LIFE Act Amendments, Pub. L. 106-554, 114 Stat. 2763 (enacting H.R. 5666, 106th Cong.) were enacted. The LIFE Act, amended provisions of the IRCA, but similarly provides that an eligible alien, who has filed an application for adjustment of status is not permitted to be deported or removed from the country while the application is still pending. See 8 C.F.R. § 245a.13(a)(1). Moreover, while the application is pending the statute provides that the alien shall be afforded the opportunity to work in the United States. Id. at § 245a.13(a)(2).

The district court found Lucio's argument to be availing and granted his motion for judgment of acquittal on March 10, 2004.[3] The United States timely appealed, arguing that irrespective of the pendency of Lucio's application for adjustment of status, he could still be charged under § 922(g)(5)(A).

## STANDARD OF REVIEW

"A motion for judgment of acquittal challenges the sufficiency of the evidence to convict." United States v. Medina, 161 F.3d 867, 872 (5th Cir. 1998). When a district court grants a motion for judgment of acquittal pursuant to FED. R. CRIM. P. 29, the determination is not entitled to exceeding deference by this court. United States v. Loe, 262 F.3d 427, 432 (5th Cir. 2001). Rather,

_____

[3] The district court's determination turned on the interplay between the LIFE Act, Pub.L.No. 106-553, which amended portions of the IRCA, 8 U.S.C. § 1255a et seq., and language from our opinion in United States v. Igbatayo, 764 F.2d 1039 (5th Cir. 1985) (per curiam), addressing the legality of an alien's presence in the country. In Igbatayo, 764 F.2d 1039 (5th Cir. 1985), an alien who had entered the United States via a student non-immigrant visa was charged under § 922(g)(6), which prohibits an individual from making a material fictitious statement to a firearm dealer in connection with the purchase of a firearm. A condition of his visa–and which permitted him to lawfully reside in the United States–required that he remain in school. The alien chose to discontinue his education following receipt of his master's degree in 1982. In 1984, he sought to purchase a firearm. When questioned by a firearm dealer as to whether he was lawfully present in the United States, he answered in the affirmative. This answer of course was false because once he stopped pursuing his education, under the terms of his visa, he was no longer lawfully present within the United States. We held that one is illegally present within the United States if they are "without authorization" to remain in the country. Id. at 1040.

Similarly, in United States v. Brissett, 720 F.Supp. 90 (S.D.Tex. 1989), a district court in this circuit issued an opinion which held that an alien who was charged under § 922(g)(5)(A), but had previously filed an application for adjustment to permanent residence status, could not be held to be unlawfully within the United States. The court in Brissett recognized that an alien who had an application pending was permitted to seek employment authorization, and, consistent with the operating instructions promulgated by the INS, deportation proceedings could not be initiated. Id. at 91. The Brissett decision has not been revisited by the Fifth Circuit. See United States v. Flores, 404 F.3d 320, 327 n.11 ("Thus, we need not, and do not, decide whether the district court in Brissett reached the correct conclusion.").

4

this court must review the decision *de novo*, employing the identical standard as did the district court. Id. Under a *de novo* standard of review, this panel must assess whether a reasonable jury could have properly concluded, weighing the evidence in a light most deferential to the verdict rendered by the jury, that all of the elements of the crime charged had been proven beyond a reasonable doubt. Id. We are not required to analyze the evidence with an eye toward negating every possible inference of innocence, rather, if the fact finder was presented with sufficient evidence to support the verdict reached, that verdict must be upheld. Id.

## DISCUSSION

The crux of the government's argument is that despite the fact that Lucio had filed an application to adjust his immigration status to that of a lawful permanent resident–which tolled the INS's ability to deport him, and provided employment authorization until his application was adjudicated–the pendency of the application did not proscribe Lucio from being charged pursuant to § 922(g)(5)(A). Lucio counters by arguing that the district court's grant of the judgment of acquittal was consistent with the basic intent of the LIFE Act's regulatory scheme. Our initial challenge therefore is to determine whether an alien who has filed an application for adjustment of status–which has not yet been acted upon by the INS–is nevertheless lawfully within the United States for the purposes of § 922(g)(5)(A).

A.

It is uncontroverted that Lucio illegally entered into the United States in 1981. In 1986, Congress enacted the Immigration Reform and Control Act (IRCA) in an effort to formally legalize aliens who had illegally entered into the United States prior to January 1, 1982. See 8 U.S.C. 1255a *et seq*. Under IRCA's terms, the alien had to meet a series of requirements before he could be termed

5

a "lawful permanent resident." See supra, note 2. First, the alien had to file an application for lawful temporary residence, which had to be granted by the INS. See 8 U.S.C. § 1255a(a). Thereafter, only then could the alien have his status adjusted to lawful permanent residence. Id. at § 1255a(b).

Pursuant to IRCA's amnesty provisions, Lucio filed an application to adjust his immigration status within the one year window articulated by the statute–May 5, 1987 and May 4, 1988. See 8 U.S.C. § 1255a(a)(1). Testimony was presented at trial which suggested that his application was rejected by the INS on the basis that the agency had concerns about the fact that Lucio had frequently left the United States in the period of time preceding the filing of his application. Despite the fact that his application was not acted upon, Lucio continued to live and work within United States for a number of years even though, technically, he was unlawfully present in the country given that: (1) he had unlawfully entered the United States, (2) his alien status had not been adjusted, and (3) his IRCA amnesty application had never been ruled upon.

Thereafter, sometime between 1999 and 2000 he apparently filed an application pursuant to the INS's Legalization Questionnaire Program. It is helpful to note that several class action lawsuits were initiated stemming from problems, which occurred in the late 1980's, related to the INS's implementation of IRCA's amnesty provisions. See Catholic Social Services, Inc. v. Meese, vacated sub nom. Reno v. Catholic Social Services, Inc., 509 U.S. 43 (1993); League of United Latin American Citizens v. INS, vacated sub nom. Reno v. Catholic Social Services, Inc., 509 U.S. 43 (1993); and Zambrano v. INS, 509 U.S. 918 (1993). As a result, aliens who filed nonfrivolous amnesty applications in accordance with IRCA, often had their applications improperly denied.

In an effort to remedy these problems, the INS allowed aliens living in the United States in an unlawful status to file legalization questionnaires to determine whether they had been "front-

6

desked" by the INS. The phrase "front- desked" is a term of art describing instances where the INS had denied an alien's IRCA legalization application on the grounds that the applicant had traveled outside the United States in contravention of INS guidelines. See, e.g., Carlos Holguin, Peter A. Schey and Charles Song, Handling "Late" Amnesty Cases: Practice and Procedure Under the INS's Legalization Questionnaire Program, 77 No. 34 Interpreters Releases 1269, 1271 (Sept. 1, 2000). Recognizing that countless aliens seeking amnesty under IRCA had their applications denied on very questionable grounds, the legalization questionnaire was intended to assist the INS to make a determination as to whether it had erroneously "front-desked" an alien during IRCA's amnesty period–May 5, 1987 through May 4, 1988. If the legalization questionnaire was approved by the INS, this would allow the alien to file a legalization application and, thereafter, the INS would issue the alien temporary employment authorization and a stay of deportation until the application was adjudicated. Id. at 1275; see also 8 C.F.R. § 245a.4(b)(14).

On September 12, 2000, Lucio was informed by the INS that his legalization questionnaire had been reviewed by the INS. The INS stated that Lucio had established that he had previously been "front-desked" by the INS when he filed his application for amnesty under IRCA during the statute's amnesty period. In the letter the INS also informed Lucio that he needed to submit, *inter alia*, a Form I-687 application (which would permit for lawful temporary status), and a Form I-765 (which would authorize employment).[4] He received employment authorization on March 14, 2001,

_____

[4] According to the record, the INS considered Lucio to have applied for LIFE Legalization on September 12, 2000. Submitting an application for LIFE Legalization simply "allows certain eligible aliens to *apply* for adjustment of status to that of a lawful permanent resident (LPR) under a modified version of [IRCA]." INS Implements LIFE Act's Legalization, Family Unit Provisions, 78 No. 22 Interpreter Releases 914, 915 (June 4, 2001) (emphasis added).

7

which permitted him to work while his application for adjustment of status was pending.[5] Consequently, Lucio avers that, because he had been granted employment authorization and was permitted to remain in the United States during the pendency of his application to adjust his immigration status, he could not be charged with being illegally or unlawfully within the United States on February 1, 2002.

We believe that Lucio's argument, while well-taken, nevertheless misconstrues his immigration status, and erroneously assumes that an alien who has filed an application to adjust his status cannot be charged under § 922(g)(5)(A). While this court has never squarely addressed the claims at issue in this case, our decision today is guided by decisions rendered by this court in similar contexts.

### B.

In United States v. Flores, 404 F.3d 320 (5th Cir. 2005), this court considered, *inter alia*, whether an alien who had applied for Temporary Protective Status (TPS) pursuant to 8 U.S.C. § 1254a, and had been charged under § 922(g)(5)(A), could be deemed to be "illegally or unlawfully" in the United States given that during the pendency of the application for TPS, the United States was prohibited from deporting the alien, and the TPS applicant was provided with "employment authorization" to continue working in the country. Id. at 322; see also 8 U.S.C. § 1254a(a)(1). Flores had argued that, because he could not permissibly be deported during the TPS application process, it necessarily followed that his presence in the United States was not unlawful. Id. at 323.

---

[5] The record further indicates that Lucio's attorney did not formally submit a completed Application for Legalization Packet until February 20, 2002.

8

The Flores court found his contention meritless, and deferred to 27 C.F.R. § 478.11, the administrative regulation promulgated by the ATF interpreting § 922(g)(5)(A).[6] We recognized that the dispositive issue before us was defining the phrase "illegally or unlawfully in the United States" as used by § 922(g)(5)(A); and of equal importance was determining whether Flores' TPS application insulated him from § 922(g)(5)(A)'s ambit. Id. at 326. The panel found that Flores could properly be charged under § 922(g)(5)(A) because: (1) he had initially entered into the United States without prior inspection, and (2) since that time he had "not been paroled into the United States under section 212(d)(5) of the [INA]." Id. at 327 (quoting 27 C.F.R. § 478.11). Consequently, Flores could still be "considered 'illegally and unlawfully in the United States.'" Id. at 327 (quoting Hussein v. INS, 61 F.3d 377, 381 (5th Cir. 1995)).

In United States v. Orellana, 405 F.3d 360 (5th Cir. 2005), a panel of this court similarly considered the question of whether an alien who had been *granted* TPS and had subsequently been charged under § 922(g)(5)(A), was illegally and unlawfully present in the United States for the purposes of the statute. Id. at 362. In Orellana, we observed that an alien who had been granted TPS

---

[6] 27 C.F.R. § 478.11 provides that an alien is "illegally or unlawfully" in the United States is one:

> (a) Who unlawfully entered the United States without inspection and authorization by an immigration officer and who has not been paroled into the United States under section 212(d)(5) of the Immigration and Naturalization Act (INA);
> (b) Who is a nonimmigrant and whose authorized period of stay has expired or who has violated the terms of the nonimmigrant category in which he or she was admitted;
> (c) Paroled under INA section 212(d)(5) whose authorized period of parole has expired or whose parole status has been terminated; or
> (d) Under an order of deportation, exclusion, or removal, or under an order to depart the United States voluntarily, whether or not he or she has left the United States.

9

was conferred significant benefits that were not similarly accorded an alien who had merely applied for TPS. For example, upon being granted TPS, the alien was considered to have lawful immigration status within the United States. Therefore, we found that Orellana was lawfully within the country and could not be charged under § 922(g)(5)(A). Id. at 366; see also 8 U.S.C. § 1254a(f)(4) (recognizing that an alien granted TPS is "considered as being in, and maintaining, lawful status as a nonimmigrant"). We further commented that the most significant difference between Flores and Orellana cases was that "an alien in receipt of TPS is in lawful status [according to the Immigration and Naturalization Act], whereas an alien who has merely been extended temporary benefits awaiting the disposition of his application for lawful status may (and often is) in an unlawful immigration status." Id. Thus, for § 922(g)(5)(A) purposes, we found that an alien (Orellana) who had been granted valid immigration valid status was permissibly within the United States, whereas the same could not be said for an alien (Flores) who was merely provided with employment authorization, and was prohibited from being deported while awaiting a ruling on his application for TPS. Id.

We conclude that Flores ultimately informs our holding. Nothing in the record compels a finding that on February 1, 2002–the date referenced in Lucio's indictment–the lawfulness (or rather, unlawfulness) of his immigration status was transformed because he had been accorded employment authorization and deportation proceedings were stayed pending the INS's ruling on his application. We conclude that the submission of an application does not connote that the alien's immigration status has changed, as the very real possibility exists that the INS will deny the alien's application altogether. Therefore, we are persuaded that the best that can be said about Lucio's unlawful immigration status is that it was in stasis, pending the INS's ruling on his application. Futher, other courts have also recognized that where an alien lacks lawful immigration status on the date

10

charged in his indictment, he was not considered to be lawfully within the United States and, therefore, bringing a charge against the alien pursuant to § 922(g)(5)(A) was entirely cognizable. In United States v. Atandi, 376 F.3d 1186 (10th Cir. 2004) an alien who had been granted a student visa, failed to abide by the conditions of his visa, and was subsequently found to be deportable by an Immigration Judge (IJ). Two months later, he possessed a firearm and was charged under § 922(g)(5)(A). He argued that because removal proceedings were still ongoing before the IJ, his presence in the United States could not be said to be unlawful. The Tenth Circuit, however, held that once the alien had committed a status violation, i.e., failing to maintain his student status–which was a prerequisite for his lawfully remaining in country–he could be charged under § 922(g)(5)(A). 376 F.3d at 1188.[7]

Moreover, in United States v. Bazargan, 992 F.2d 844 (8th Cir. 1993), an alien whose student visa expired subsequent to his possessing a firearm, was charged under § 922(g)(5)(A). He nevertheless averred that he was not illegally or unlawfully in the United States because he had been provided employment authorization pending a ruling on his amnesty application. The panel strongly disagreed, observing that "[b]ecause the INS does not interpret the employment authorization to have any effect on the alien's status with respect to anything other than his ability to engage in employment during the pendency of his case . . . t he employment authorization did not have the effect of

---

[7] Somewhat notably, the panel in Atandi also expressed strong reservations about whether an alien authorized to work in the United States during the pendency of his amnesty application, was lawfully within the United States for under § 922(g)(5)(A) purposes. 376 F.3d at 1192 n.12. But see United States v. Bravo-Muzquiz, -- F.3d -- , 2005 WL 1404573, at *3 (9th Cir. June 16, 2005) (agreeing with Atandi's holding, but implying in dicta that if an alien had filed an application for adjustment of status prior to possessing a firearm, he likely could not be charged under § 922(g)(5)(A)).

11

converting Bazargan back into a legal alien." Id. at 849. We believe the foregoing observation in Bazargan accords with the reasoning employed by this court in Flores, *supra*.

## CONCLUSION

Accordingly, on February 1, 2002, Lucio was still deemed to be unlawfully within the United States irrespective of the fact that he had received employment authorization. Further, because in the interim between the INS's adjudication of his application, his unlawful immigration status remains undisturbed, we hold that Lucio could permissibly be charged under § 922(g)(5)(A).[8] Accordingly, we reverse.

REVERSED AND REMANDED.

---

[8] We note that under § 922(g)(5)(B), an alien *granted* a nonimmigrant visa, with certain exceptions, is not permitted to carry a firearm. Thus, we think it would fashion a peculiar result if we were to hold that an alien unlawfully within the United States who has simply submitted an application to adjust his status may permissibly possess a firearm, whereas an alien granted a nonimmigrant visa–and concomitantly, temporary lawful immigration status–may not. We do not believe such reasoning is tenable. Therefore, our holding today harmonizes § 922(g)(5)(A) and § 922(g)(5)(B), and thereby accords with the underlying intentions of both statutes. See Airline Pilots Assoc. Int'l. v. Taca Int'l Airlines, S.A., 748 F.2d 965, 969 (5th Cir. 1984) ("It is axiomatic that statutes . . . are to be interpreted, to the *maximum* extent possible, so as to be consistent and harmonious.") (emphasis added).