United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 26, 2006**

Charles R. Fulbruge III
Clerk

In the

United States Court of Appeals

for the Fifth Circuit

_____

№ 04-20123
Summary Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

IBRAHIM HASSAN ELRAWY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas
№ 4:03-CR-29-ALL

_____

Before SMITH, GARZA, and PRADO,
Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Ibrahim Elrawy appeals his conviction of violating 18 U.S.C. § 922(g)(5)(B) by being an alien admitted under a nonimmigrant visa who possessed a firearm (count one) and of violating *id.* § 922(g)(5)(A) by being an alien illegally present in the United States who possessed a firearm (count two). We affirm as to count two, reverse as to count one, vacate the sentence, and remand.[1]

_____

[1] Elrawy also appeals the denial of his motion for new trial. The district court did not set forth reasons for denial. The government contends the motion was properly denied because it was untimely.

(continued...)

## I.
### A.

Elrawy is a native and citizen of Egypt who was admitted to the United States on a non-immigrant visa on May 17, 1994. The visa authorized him to remain in the United States not more than six months, so he was required to depart on or before November 16, 1994. He did not depart, and therefore his stay in the United States was "unauthorized" as of November 17, 1994.

In December 1994 Elrawy married an American citizen, Laura Reynolds Fucich, who filed on Elrawy's behalf an I-130 petition, which requests that a spouse or family member be granted legal status to remain in the United States. Elrawy then filed an I-485 application whereby he requested adjustment of his status to that of a lawful permanent resident.

In a January 1996 interview with immigration officials, Fucich confessed that her union with Elrawy was a marriage of convenience that had never been consummated. Fucich withdrew her I-130 petition, and Elrawy was served with a notice to show cause and was placed in deportation proceedings in 1996.

In July 1996, Elrawy was notified that he won an immigration "lottery" for fiscal year 1997, which might have allowed him to obtain a diversity visa and gain legal status if he filed a timely visa petition and satisfied other criteria. Elrawy, however, filed a petition that was too early, and then another one that was too late, so he did not gain legal status through the lottery.

After divorcing Fucich, Elrawy married another American citizen, Angela Rosenbaum; together they have a daughter. In August 1998, Rosenbaum filed on Elrawy's behalf an I-130 petition that the Immigration and Naturalization Service ("INS") approved on June 25, 1999. At trial an INS agent testified that the grant of the I-130 petition still stood but that it had not been granted properly, apparently because Elrawy had had a fraudulent marriage. The INS agent agreed, however, that the grant of the I-130 petition placed Elrawy "on the path to getting a visa."

In March 2000 Elrawy openly purchased a gun from a sporting goods store. He filed the required paperwork, furnishing, among other things, information concerning his country of citizenship and address. He correctly showed the required information, except that he did not provide his immigration "A-number" and did not specify that he was illegally in the United States; these omissions supposedly were because he thought the approval of the visa petition and the pendency of his adjustment of status application meant he was lawfully in the United States.

Elrawy was approved to receive a gun based on his criminal background check, because he had no convictions. He also applied for a state gun permit and again provided all the required information. There is no dispute that he purchased a gun that had traveled in interstate commerce as required by the statute of conviction.

---

[1](...continued)

Where a motion for new trial is based on any reason other than newly discovered evidence, it must be filed within seven days after the verdict or finding of guilt. FED. R. CRIM. P. 33(b)(2). Elrawy's motion did not purport to rely on newly discovered evidence. Because the motion, filed on January 23, 2004, was not filed within seven days of the July 16, 2003, verdict, it was properly denied as untimely.

### B.

At trial Elrawy moved, at the close of the government's case, for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. He argued, as to count one, that his nonimmigrant visa had expired in 1994, and thus, under a proper interpretation of the relevant statutory language, he could not be convicted under § 922(g)(5)(B) based on his purchase of a weapon in March 2000. The district court disagreed. At to count two, Elrawy argued that he was in the United States legally because of his wife's approved visa petition.[2]

The jury returned a guilty verdict on both counts. The district court sentenced Elrawy to a concurrent 21-month terms of imprisonment on each count and to a three-year term of supervised release. He was fined $40,000 and was given a special assessment of $200.

### II.

Both of Elrawy's convictions were under subparts of § 922(g)(5), which makes it unlawful for any person "who, being an alien— (A) is illegally or unlawfully in the United States; or (B) except as provided in subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101-(a)(26)))" to posses a firearm that has traveled in interstate commerce. § 922(g)(5). Elrawy argues that at the time of the gun purchase, he was not "admitted to the Unites States under a nonimmigrant visa" because his visa had expired, and that he was not "illegally or unlawfully" in the United States, because he had filed an application for adjustment of status. These are both legal issues of statutory interpretation and so are reviewed *de novo*. *United States v. Santos-Riviera*, 183 F.3d 367, 369 (5th Cir. 1999).

### III.

The terms "illegally and unlawfully," as used in § 922(g)(5)(A), are not specifically defined in the criminal statutes or immigration statutes or regulations. These terms must therefore be given their ordinary and natural meanings. *United States v. Orellana*, 405 F.3d 360, 365-66 (5th Cir. 2005).

In *Orellana* we observed that "'[d]ictionaries are a principal source for ascertaining the ordinary meaning of statutory language.'" *Id.* We explained that, read in the context of § 922(g)(5)(A), the dictionary definitions indicate that an alien "illegally or unlawfully in the United States" is an alien whose presence within the United States is "forbidden or not authorized by law," *id.*, and we noted that this definition is consistent with our description of an illegal alien as one who is "'in the United States without authorization,'" *id.* at 366 n.36 (citing *United States v. Igbatayo*, 764 F.2d 1039, 1040 (5th Cir. 1985)). This is also consistent with the statutory definition, in immigration statutes, of the term "unlawful presence" as presence in the United States after

---

[2] As to count two, Elrawy also argued that the superseding indictment charged him with possessing a weapon on or about March 11, 2003, rather than 2000. He objected to an amendment of the indictment and sought permission to argue to the jury that the evidence did not show possession as of the date charged in the indictment.

The district court refused to allow Elrawy to make that argument, and it indicated that it would instruct the jury that the date as to count two should read March 11, 2000. Elrawy renewed his motion for a judgment of acquittal after he formally rested. The district court instructed the jury that there had been a "typographical error" and inserted the date "March 11, 2000," into the indictment for count two.

expiration of the period of the stay authorized by the Attorney General or presence in the United States without being admitted or paroled. *See* 8 U.S.C. § 1182(a)(9)(B)(ii).

In *Orellana* we also looked to the structure and purposes of the statute and noted that they support the view that Congress sought to rule broadly to keep guns out of the hands of those who have demonstrated that "'they may not be trusted to possess a firearm without becoming a threat to society.'" *Orellana*, 405 F.3d at 366 n.36. Illegal aliens are likely to be in that category because they are "'likely to maintain no permanent address in this country, elude detection through an assumed identity, and—already living outside the law—resort to illegal activities to maintain a livelihood.'" *Id.*

We noted that Orellana, who had entered the country illegally, nevertheless later received Temporary Protected Status ("TPS") and thus was "unlike illegal aliens who attempt to avoid detection." *Id.* Rather, he revealed his "whereabouts to the government" and was authorized to secure employment, *id.*, so he was not "part of an underground population of persons, who, unable to secure lawful employment, have a greater likelihood to engage in criminal conduct," *id.* Because aliens who receive TPS are allowed to remain in the United States and work and are allowed to apply for adjustment of status as if they possessed lawful non-immigrant status, we found that Orellana was not unlawfully present in the United States.

Elrawy relies on *United States v. Brissett*, 720 F. Supp. 90 (S.D. Tex. 1989), which held that an alien who was charged under § 922(g)-(5)(A), but who had a pending application for adjustment to permanent residence status, could not be found to be unlawfully within the United States. The court in *Brissett* recognized that an alien who filed an application for adjustment was not "without authorization" to stay in the United States. *Id.* at 91. Rather, he was permitted to remain in the country while his application was pending and was permitted to seek employment authorization, and, consistent with the operating instructions promulgated by the INS, deportation proceedings could not be initiated. *Id.*

In *United States v. Flores*, 404 F.3d 320, 327 n. 11 (5th Cir. 2005), we declined to address whether *Brissett* was correctly decided, but we rejected *Brissett* in *United States v. Lucio*, 428 F.3d 519 (5th Cir. 2005), in which we held that a formerly illegal alien who applies for adjustment of status is not in lawful status merely because he is allowed to remain in the United States while his application is pending. We concluded that "the submission of an application does not connote that the alien's immigration status has changed, as the very real possibility exists that the INS will deny the alien's application altogether." *Id.* at 525.

Lucio, who had entered the country illegally, remained unlawfully and illegally in the United States for purposes of § 922(g)(5)(A). *Id.* at 526. Elrawy acquired illegal or unlawful status when he remained in the United States after the expiration of the authorized stay on November 16, 1994.[3]

Thus, under *Lucio*, because Elrawy acquired unlawful status on account of his overstay, his unlawful status did not change merely

---

[3] 8 U.S.C. § 1182(a)(9)(B)(ii); *Orellana*, 405 F.3d at 365-66 (explaining that an alien is "illegally or unlawfully in the United States" is an alien whose presence within the United States is "forbidden or not authorized by law").

by his filing the application for adjustment of status, and he is not insulated from prosecution under § 922(g)(5)(A). The fact that his wife's I-130 petition in his favor was approved is also of no avail, because the approval of the petition is only one step in the application for adjustment of status.[4]

The answer implicitly given in *Lucio* is that an alien who has acquired unlawful or illegal status (either by overstaying a visa or illegally crossing the border without admission or parole) cannot relinquish that illegal status until his application for adjustment of status is approved.[5] We are bound by *Lucio*, which gives primacy to the applicant's legal status *before* he files an application for adjustment of status, as opposed to his *current* status (permitted to stay in the United States during the pendency of such application),[6] so the conviction under § 922(g)(5)(A) is affirmed.

## IV.

Count one is a different matter. It charged a violation of § 922(g)(5)(B), which criminalizes possession of a firearm by an alien who "has been admitted to the United States under a nonimmigrant visa." As the government correctly notes, it is beyond cavil that Elrawy was admitted to the United States on a nonimmigrant visa for a period of six months in 1994, that his nonimmigrant visa expired in November 1994, and that he possessed a firearm in 2000. The real issue is thus one of statutory interpretation: Does § 922(g)(5)(B) apply where the defendant's nonimmigrant visa has expired before his possession of the firearm and he is thus in the United States *ille-*

---

[4] To obtain an immigrant visa based on marriage to a United States citizen, the American spouse must first file a Form I-130 Petition for Alien Relative to establish his or her relationship to the spouse who seeks to immigrate to the United States. *See* 8 U.S.C. §§ 1151, 1154. If immigration officials approve the I-130 application, the alien spouse must then file a Form I-485 Application To Register for Permanent Residence or Adjust Status. *See* 8 U.S.C. § 1255.

[5] *See also United States v. Bazargan*, 992 F.2d 844, 848-49 (8th Cir. 1993) (holding that an alien was subject to § 922(g)(5)'s firearm disability even though he had filed an asylum petition, because "the employment authorization did not have the effect of converting Bazargan back into a legal alien").

[6] Not all courts follow this approach. As reasoned by the court in *United States v. Hernandez*, 913 F.2d 1506, 1513-14 (10th Cir. 1990),

(continued...)

[6](...continued)
Because aliens in the process of applying for legalization of their immigration status may not be deported, 8 U.S.C. §§ 1160(d) & 1255a(e), they are not unlawfully in the United States and thereby subject to prosecution under § 922(a)(6). Consequently, to be prosecuted under § 922(g)(5), an alien seeking amnesty under 8 U.S.C. § 1160 or § 1255 must either receive a firearm before filing an amnesty application or after such application is denied.

*See also United States v. Bravo-Muzquiz*, 412 F.3d 1052, 1055 (9th Cir. 2005):

In *United States v. Garcia*, 875 F.2d 257 (9th Cir. 1989), we held that an alien who had not been legally admitted to enter the United States and who had not applied for legal status at the time he possessed a firearm was "illegally or unlawfully in the United States" for purposes of section 922(g)(5). *Id.* at 257-58. Implicitly this recognizes that had Garcia applied for legal status prior to his possession of the firearm he would not have been at that time an alien illegally or unlawfully in the United States.

*gally*?

The government argues that even if the visa had expired and Elrawy was here illegally after the expiration, he could be convicted under both §§ 922(g)(5)(A) and 922(g)(5)(B) because there is no violation of the prohibition against multiple punishments for the same offense, in light of the fact that each prong of the statute requires something that the other does not. This argument, however, was flatly rejected in *United States v. Munoz-Romo*, 989 F.2d 757 (5th Cir. 1993), which the government fails to cite. In that case, which we decided after a contrary opinion had been summarily reversed by the Supreme Court,[7] we held that "the language and structure of Section 922(g) disclose Congress's clear intent not to impose cumulative punishments when the same incident violates two subdivisions of subsection (g)."

In *Munoz-Romo* we relied on the factually similar *United States v. Winchester,* 916 F.2d 601 (11th Cir. 1990), in which the court noted that application of the *Blockburger* test would yield a different result, but the court found the statute's structure and legislative history "plainly expressed contrary view on the part of Congress" that supported the defendant's interpretation. *Id.* at 606- 07 (quoting *Garrett v. United States*, 471 U.S. 773, 779 (1985)). We noted that this type of case is unlike *Blockburger*, which addressed a situation in which Congress had criminalized different actions, in different statutes, at different times; we observed that Congress had created § 922 and its structure in one enactment, signaling that "it did not intend multiple punishments for the possession of a single weapon." *Munoz-*

---

[7] *See Munoz-Romo v. United States*, 506 U.S. 802 (1992).

*Romo*, 989 F.2d at 759.

We agreed with the Eleventh Circuit that to conclude otherwise would mean that "a convicted felon who is also a fugitive from justice, a drug addict, a 'mental defective,' and an illegal alien, could be sentenced to five consecutive terms of imprisonment for the same incident, namely, possession of a firearm." *Id.*. Rather, the statute's structure, and the fact that Congress provided criminal penalties for the violation of subsection (g) of § 922 but did not list separate penalties for the separate subdivisions of subsection (g), indicated that Congress sought "only to bar the possession of firearms by certain types of persons that it considered dangerous," and not to punish persons "solely for having a certain status under the law." *Winchester,* 916 F.2d at 605-07.

Double jeopardy for the convictions under §§ 922(g)(5)(A) and 922(g)(5)(B) is not an issue here, however, because it is not raised on appeal. Nonetheless, the analysis in *Munoz-Romo* and *Winchester* with respect to Congress's intent not to impose cumulative punishments is instructive.

The appropriate starting point when interpreting any statute is its plain meaning. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989). "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). "It is axiomatic that statutes . . . are to be interpreted, to the maximum extent possible, so as to be consistent and harmonious." *Airline Pilots Ass'n Int'l v. Taca Int'l Airlines, S.A.*, 748 F.2d 965, 969 (5th Cir. 1984).

6

Because Elrawy "has been admitted . . . under a nonimmigrant visa" in 1994, he could conceivably fall within the ambit of § 922-(g)(5)(B) notwithstanding the fact that such visa had expired before he possessed a firearm. But, as his attorney argued at trial, under this interpretation of the statute even a non-immigrant who became a lawful permanent alien and has not left the United States since his initial admittance under a non-immigrant visa could be prosecuted, because he is an alien who has been admitted under a non-immigrant visa. That result would be absurd.

Therefore, it is implicit that an event that changes the alien's legal non-immigrant status —either from that of lawful non-immigrant to lawful immigrant (permanent resident) or from lawful non-immigrant to unlawful immigrant—renders this provision unavailable as to him. This is especially so given that an unlawful immigrant is already covered by § 922-(g)(5)(A).

That is to say, the structure of the statute supports the position Elrawy took in the district court in moving for judgment of acquittal on count one. Aliens "illegally or unlawfully" in the United States are prohibited from possessing firearms under § 922(g)(5)(A), but aliens admitted on nonimmigrant visas (and hence not illegally or unlawfully in the United States) are prohibited from possessing firearms under § 922(g)(5)(B), with certain exceptions. *See* § 1915(y)(2).[8]

Because "'[s]pecific words within a statute . . . may not be read in isolation of the remainder of that section or the entire statutory scheme,'" *Davis v. Fechtel*, 150 F.3d 486, 488 (5th Cir. 1998) (citation omitted), only aliens who were admitted to the United States on a non-immigrant visa and maintain *lawful* "non-immigrant" status can be prosecuted under § 922(g)(5)(B). Aliens no longer in lawful non-immigrant status (1) are not to be prosecuted if they purchased the gun after they acquired lawful immigrant status and (2) can be prosecuted under § 922(g)(5)(A) if they purchased the gun after they acquired unlawful status.

In the absence of evident congressional intent to render conduct such as Elrawy's subject to prosecution under both § 922(g)(5)(A) and § 922(g)(5)(B), our interpretation is also supported by the rule of lenity, which "rests on the fear that expansive judicial interpretations will create penalties not originally intended by the legislature." *Winchester,* 916 F.2d at 605-07 (citing 3 N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 59.03 (4th ed. 1986)). It is "an outgrowth of our reluctance to increase or multiply punishments absent a clear and definite legislative directive." *Simpson v. United States*, 435 U.S. 6, 15-16 (1978). By the application of lenity, courts "'will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended.'" *Id.* at 15 (quoting *Ladner v. United States*, 358 U.S. 169, 178 (1958)).[9]

---

[8] Section 922(g)(5)(B) contains an exception for various limited classes of aliens, including those admitted to the United States for lawful hunting or sporting purposes, and "foreign law enforcement officer[s] of a friendly foreign government entering the United States on official law enforcement business." *See* § 922(g)(5)(B), (y)(2).

---

[9] For purposes of this statute, a lawful nonimmigrant who applies for adjustment of status remains an alien "admitted . . . under a nonimmigrant

(continued...)

7

The judgment of conviction on count two is AFFIRMED, and the conviction on count one is REVERSED. The judgment of sentence is VACATED, and this matter is REMANDED for resentencing and any other appropriate proceedings.

---

[9](...continued)
visa" because only the approval of the adjustment of status would change his status from that of "admitted . . . under a nonimmigrant visa" to that of a lawful permanent resident. Such alien may be an immigrant for the purposes of other statutes (because he has abandoned the intention to return to the home country), but this statute looks to his "admittance visa."