FILED
United States Court of Appeals
Tenth Circuit

April 11, 2008

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JUAN OCHOA-COLCHADO,

Defendant-Appellant.

No. 07-4023

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 2:06-CR-0425-PGC)**

---

Scott Keith Wilson, Assistant Federal Public Defender (Steven B. Killpack, Federal Public Defender, with him on the briefs), Salt Lake City, Utah, for Plaintiff-Appellant.

Diana Hagen, Assistant United States Attorney (Brett L. Tolman, United States Attorney and Elizabethanne C. Stevens, Assistant United States Attorney, on the brief), Office of United States Attorney, Salt Lake City, Utah, for Defendant-Appellee.

---

Before **BRISCOE, SEYMOUR,** and **LUCERO**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

Defendant-Appellant Juan Ochoa-Colchado (Defendant) entered a

conditional guilty plea to one count of possession of firearms while being an alien

illegally or unlawfully in the United States, in violation of 18 U.S.C. § 922(g)(5)(A).[1] Prior to pleading guilty, Defendant moved to dismiss the indictment, arguing that he was not in the United States illegally within the meaning of the statute. The district court denied this motion. On appeal, Defendant renews his argument that he was not in this country illegally at the time of the firearm possession, and he also contends that 18 U.S.C. § 922(g)(5)(A) is unconstitutionally vague as applied to him. We have jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I.

Defendant is a native and citizen of Mexico. He unlawfully entered the United States as early as 1989, and was convicted of illegal entry in violation of 8 U.S.C. § 1325 in 1993. Defendant was not deported and remained in this country. In October 2002, the government initiated removal proceedings against him. In response, on October 25, 2002, Defendant filed a Form EOIR-42B, "Application for Cancellation of Removal and Adjustment of Status," pursuant to section 240A(b)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1229b(b)(1). At all times relevant to this case, this application was still pending before an

---

[1] As is pertinent here, 18 U.S.C. § 922(g)(5)(A) provides that "[i]t shall be unlawful for any person . . . who, being an alien . . . is illegally or unlawfully in the United States . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition . . . ."

2

immigration judge.[2]  The parties agree that the government will not deport an alien after he has filed such an application unless and until an immigration judge denies the application.  Defendant also applied for an Employment Authorization Document (EAD) under 8 C.F.R. § 274a.12(c)(10), which would allow him to work while residing in the United States.  Based on his pending application for adjustment of status, Defendant received an EAD on November 21, 2002, and has renewed it on a yearly basis.

On June 3, 2006, the police stopped Defendant for a traffic violation, and subsequently arrested him after he performed poorly on field sobriety tests. While searching Defendant's vehicle, officers discovered a loaded handgun and ammunition.  After receiving *Miranda* warnings, Defendant stated that he had three other guns at his home.  The following day, officers searched Defendant's home pursuant to a valid search warrant and discovered ten additional firearms.

On June 14, 2006, a grand jury indicted Defendant on one count of possessing eleven firearms while being an alien illegally or unlawfully in the

---

[2] The parties disagree as to whether Defendant filed a second application in May 2006.  The district court stated that he did, and Defendant's brief asserts that he did—but Defendant conceded before the district court that he had not done so. See Def.'s Reply in Supp. of Mot. to Dismiss, Supp. Vol. I, Doc. 20, at 2 n.2; id. Ex. 1, at 4 ¶ 8.  Whether he filed a second application is irrelevant for our purposes.  The issue presented turns on whether a pending application for adjustment of status renders an alien's presence in the United States lawful for purposes of 18 U.S.C. § 922(g)(5), and it is undisputed that Immigration & Customs Enforcement had still not taken action on the first application at the time Defendant possessed the firearms in question.

3

United States, in violation of 18 U.S.C. § 922(g)(5)(A). Defendant moved to dismiss the indictment, arguing that he could not be prosecuted under § 922(g)(5)(A) because "aliens in the process of applying for legalization cannot be deported [and] are not unlawfully in the United States." Mot. to Dismiss, Supp. Vol. I, at 1. The district court denied the motion, concluding that a pending application for adjustment of status, even when coupled with the receipt of an EAD, did not render Defendant's presence in the United States legal or permit his possession of firearms.

After the district court denied his motion to dismiss the indictment, Defendant entered a conditional guilty plea, in which he reserved his right to appeal the denial of his motion. Defendant was subsequently sentenced to twelve months and a day of incarceration, to be followed by twenty-four months of supervised release. On appeal, Defendant again argues that he was not in the United States illegally at the time he possessed the firearms, and also argues that § 922(g)(5)(A) is unconstitutionally vague as applied to the facts of his case.

## II.

Under 18 U.S.C. § 922(g)(5)(A), an alien who "is illegally or unlawfully in the United States" is prohibited from possessing any firearms or ammunition. The phrase "illegally or unlawfully in the United States," which is the focus of this appeal, is not defined by statute. The district court concluded that Defendant's pending application for adjustment of status, which permitted him to

4

remain in the country temporarily, did not render his presence in this country lawful, even when coupled with the receipt of an EAD. Because the issue presented turns on the proper interpretation of § 922(g)(5)(A), our review is *de novo*. United States v. Atandi, 376 F.3d 1186, 1187 (10th Cir. 2004).

In United States v. Hernandez, which was also an alien-in-possession case, we suggested that "[b]ecause aliens in the process of applying for legalization of their immigration status may not be deported, they are not unlawfully in the United States" for purposes of § 922(g)(5)(A). United States v. Hernandez, 913 F.2d 1506, 1513 (10th Cir. 1990) (citations omitted). However, in that case we were not asked to decide whether an alien who filed an application for adjustment of status *before* his possession of firearms was "unlawfully in the United States" for purposes of § 922(g)(5)(A). The defendant in Hernandez had filed an application for adjustment of status only *after* obtaining the firearms in question. We concluded a subsequent application for adjustment of status did not operate retroactively to render the defendant's prior possession lawful. Id. at 1514. Thus, as we have previously recognized, our added discussion of whether the result would have been different if the defendant had filed his application *before* receiving the firearm was dicta. See Atandi, 376 F.3d at 1192 n.12 ("We have doubts about the dicta in Hernandez suggesting that an amnesty applicant's authorization to seek employment in the United States is equivalent to authorization to reside in this country for purposes of § 922(g)(5)."). Further, as

5

discussed in more detail below, the greater weight of authority is of the view that the filing of an application for adjustment of status before an alien's possession of firearms does not alter the alien's status. Of the three other cases suggesting or holding that a pending application for adjustment of status renders an alien's presence in this country lawful, two are no longer good law. Compare United States v. Brissett, 720 F. Supp. 90 (S.D. Tex. 1989), abrogation recognized by United States v. Elrawy, 448 F.3d 309, 313 (5th Cir. 2006), and United States v. Bravo-Muzquiz, 412 F.3d 1052, 1054-55 (9th Cir. 2005), overruled by United States v. Latu, 479 F.3d 1153, 1158 (9th Cir. 2007), with Yesil v. Reno, 958 F. Supp. 828, 843 (S.D.N.Y. 1997).

Our decision in United States v. Atandi suggests that Defendant was not legally in the United States by virtue of the stay of his removal proceedings. In Atandi, 376 F.3d at 1187, the defendant overstayed his student visa, and an immigration judge found him deportable. However, the defendant was permitted to remain in the United States pending the outcome of later hearings on the issue of relief from removal. Id. During this interim period, he was arrested and charged under § 922(g)(5)(A) for possession of several firearms. Id. We held that the fact that no final removal order had been issued did not preclude the defendant's conviction. Id. at 1188, 1190.

The facts of Atandi parallel those in the instant case. While Atandi entered the country legally and only later lost his legal status, Defendant was here

6

illegally from the outset. The government instituted removal proceedings against both Atandi and Defendant, and permitted both to remain in the country until the proceedings were finalized. Were we to conclude that Defendant was legally in the country while Atandi was not, our only justification for distinguishing Defendant from Atandi would be Defendant's unilateral action in filing an application for adjustment of status. This result is not compelling.

Defendant attempts to distinguish Atandi by arguing that this case is more analogous to cases that involve aliens granted Temporary Protected Status (TPS) under 8 U.S.C. § 1254a. Defendant relies primarily upon United States v. Orellana, 405 F.3d 360 (5th Cir. 2005), where the Fifth Circuit held that an alien who had applied for and was granted TPS was not "illegally or unlawfully in the United States" for purposes of § 922(g)(5)(A). In reaching this conclusion, the court found that the benefits the defendant had received as a result of his TPS gave him "a form of lawful status throughout the time his TPS registration was effective." Id. at 366. Those benefits included protection from removal or detention due to immigration status, the ability to work in the United States, and the ability to travel abroad without losing his immigration status. Id. at 363-64; see 8 U.S.C. § 1254a(f). Defendant argues that because his application for adjustment of status and EAD entitle him to two of the same benefits—non-removability during the pendency of his application and the ability to work in the United States—his status is also lawful.

7

If we were to accept Defendant's argument that his status is similar to that of an alien granted TPS, we would have to reject other holdings set forth in Orellana. The Orellana court expressly considered whether its reasoning extended to cases like the one before us, and concluded that it did not. The court noted that in a prior case, it had held that an alien who had received temporary benefits on account of his pending TPS application was not lawfully present in the United States for purposes of § 922(g)(5)(A). Orellana, 405 F.3d at 369-70 (citing United States v. Flores, 404 F.3d 320 (5th Cir. 2005)). In Flores, the court remarked that while an alien with no authorization whatsoever is clearly here illegally, this does not mean that an alien who has received "limited temporary authorization (i.e., a temporary stay of removal and a temporary work permit) is in the country legally for all purposes, rendering him immune to prosecution under § 922(g)(5)(A)." Flores, 404 F.3d at 327. Instead, "an alien may be temporarily granted a stay of removal and be permitted to work during that stay, but still be considered 'illegally or unlawfully in the United States.'" Id. The Orellana court found the decision in Flores "unassailably correct," and drew a distinction between an alien whose application for TPS was pending and an alien who had been granted TPS: "an alien in receipt of TPS is in lawful status, whereas an alien who has merely been extended temporary benefits awaiting the disposition of his application for lawful status may be (and often is) in an unlawful immigration status." Orellana, 405 F.3d at 370.

8

Orellana provides no support for Defendant as it rejects Defendant's position, and concludes that an alien's unlawful presence in the United States becomes lawful only after the alien's application for adjustment of status is actually approved. See United States v. Elrawy, 448 F.3d at 314 ("[A]n alien who has acquired unlawful or illegal status (either by overstaying a visa or illegally crossing the border without admission or parole) cannot relinquish that illegal status until his application for adjustment of status is approved."). This conclusion is consistent with the TPS statute, which provides that an alien who has been granted TPS "shall be considered as being in, and maintaining, lawful status as a nonimmigrant" for limited purposes. 8 U.S.C. § 1254a(f)(4). It contains no similar provision for aliens who have merely applied for TPS. Nor is there any such provision applicable to aliens who have only applied for an adjustment of status. This key distinction between an *application* for adjustment of status and the *grant* of an adjustment of status provides the basis for our refusal to extend Orellana and other TPS cases to the facts of this case.

Further, in a later case with facts almost identical to those of the instant case, the Fifth Circuit refined its position, making clear that Defendant would not be entitled to relief under that circuit's precedent. In United States v. Lucio, 428 F.3d 519, 520 (5th Cir. 2005), the defendant entered the United States illegally, and later filed an application to adjust his status. While his application was pending, the defendant also received an EAD and could not be deported. Id. The

9

court rejected the defendant's argument that his pending application and EAD rendered him lawfully present in the United States for purposes of § 922(g)(5)(A), concluding that "the submission of an application does not connote that the alien's immigration status has changed, as the very real possibility exists that the INS will deny the alien's application altogether." Id. at 525. "[T]he best that can be said" about the status of an alien in Defendant's position "is that it [is] in stasis, pending the INS's ruling on his application." Id. Moreover, because 18 U.S.C. § 922(g)(5)(B) prevents some aliens who have already been *granted* a visa from possessing firearms, "it would fashion a peculiar result . . . to hold that an alien . . . who has simply submitted an application to adjust his status may permissibly possess a firearm, whereas an alien granted a nonimmigrant visa—and concomitantly, temporary lawful immigration status—may not." Id. at 526 n.8. Defendant would have us reach this "peculiar result."

The Ninth Circuit has also held that the filing of an application for adjustment of status does not legalize an alien's presence in the United States. Latu, 479 F.3d at 1159. The Eighth Circuit has also suggested that it would reach the same result, holding that an alien who has received an EAD while his application for asylum is pending is not in the country legally.[3] United States v.

_____

[3] Defendant apparently takes issue with this result, pointing to a footnote in an Eleventh Circuit case that states that "[i]ndividuals legally present in the United States and in the process of becoming a legal resident are eligible for EAD cards, while those illegally in the U.S. are not." United States v. Ciarrochi, 167

(continued...)

10

<u>Bazargan</u>, 992 F.2d 844, 848-49 (8th Cir. 1993).  In reaching this conclusion, the court noted that at the time an EAD is issued, the immigration authorities have made no determination as to the alien's status, but have simply determined that the alien's application is non-frivolous.  <u>Id.</u> at 849.  The same is true of the government's agreement to stay removal proceedings during the pendency of an application for adjustment of status.  In granting a stay, the government does not express any view as to the validity of an alien's application or change the alien's status in any way.  As the district court in the present case remarked, "[i]t would be illogical to conclude that *application* for a change of status has the same legal effect as receiving new status.  If that were the case, the government would never have to approve an application—a mere filing would be sufficient."  Order Den. Mot. to Dismiss, Aplt. Br., App. B, at 6.

Defendant also argues that the policy considerations underlying <u>Orellana</u> are applicable here.  The <u>Orellana</u> court noted that section 922's purpose was to keep firearms "out of the hands of those typically considered dangerous or irresponsible."  405 F.3d at 366.  Illegal aliens are included in this group because

---

[3](...continued)
Fed. Appx. 151, 152 n.1 (11th Cir. 2006) (citing 8 C.F.R. § 274a.12).  Defendant claims that this supports his argument that his receipt of an EAD means that he is legally in the United States.  We disagree.  Many classes of persons who are in the United States illegally are eligible for EADs under 8 C.F.R. § 274a.12(c), including those persons who, like Defendant, are awaiting the outcome of their pending applications, and, notably, aliens against whom final orders of removal have been issued but who cannot be removed.  <u>See generally</u> 8 C.F.R. § 274a.12(c)(8)-(24).

they have "already violated a law of this country" and are "likely to maintain no permanent address in this country, elude detection through an assumed identity, and—already living outside the law—resort to illegal activities to maintain a livelihood." Id. at 368 (quoting United States v. Toner, 728 F.2d 115, 128 (2d Cir. 1984)). Aliens who have received TPS, by contrast, "have purposefully revealed their whereabouts to the government with the intent of receiving legal protection from deportation and authorization to seek employment" and therefore "are not part of an underground population of persons who, unable to secure lawful employment, have a greater likelihood to engage in criminal conduct." Id. Defendant claims that he is in a similar position as an alien granted TPS because he "maintained lawful employment, renewed his EAD every year, kept the Government informed of his current residence, and was generally available to the Government throughout its processing of his applications." Aplt. Br. at 10. He was therefore not an alien "whose presence was unknown or undocumented, or who was unable to work and therefore resorted to criminal activity to support himself." Id.

Our adoption of Defendant's position would lead to untenable results for a number of parties—including aliens who are in the same position as Defendant. According to Defendant's view, an alien who has applied for adjustment of status would be in the United States "legally," and thus able to possess firearms, only until his application was denied. At that point, the alien would automatically

12

become a felon by virtue of his possession of the firearms, despite the probability of the alien's having little or no prior notice of when the government intends to deny his application. To permit aliens to legally possess firearms pending the resolution of their applications for adjustment of status would compromise the safety and security of U.S. citizens and residents because those aliens would be able to obtain firearms during the pendency of their applications—and they would still have those weapons upon being forced "underground" when their applications are denied. Cf. Atandi, 376 F.3d at 1190 n.9 ("We can envision no reason why Congress would grant illegal aliens the ability lawfully to arm themselves precisely at the moment the government commences its effort to remove them from the country."). Finally, as the district court noted, firearms dealers would be disadvantaged because they would have no way of knowing whether a particular alien is legally or illegally in the United States, or whether his application had been granted or denied, thereby exposing the dealers to criminal liability under 18 U.S.C. § 922(d)(5)(A). These countervailing policy considerations make it unlikely that Congress intended to exclude from § 922(g)(5)(A) those aliens who have merely filed applications for adjustment of status.

An alien who has filed for adjustment of status and received an EAD may in some sense be "authorized" to be in the United States, inasmuch as he is granted a temporary reprieve from removal proceedings and permitted to work

13

here pending the outcome of his case. But there is a distinction to be drawn between tolerating an alien's presence for a limited purpose and legalizing an alien's presence. The Fifth Circuit recognized that distinction, and its description of the status of an alien whose application is pending as a sort of "stasis" is as good a description as can be found in any case. See Lucio, 428 F.3d at 525. To paraphrase the district court in the present case, it is one thing to let an alien remain in this country and work while the government completes its review of the alien's application, yet it is another thing altogether to permit an alien to possess firearms simply because he filed an application that has not been granted. See Tr. of Mot. Hr'g, Supp. Vol. II, at 5. We conclude that Defendant, despite his filing of an application for adjustment of status and receipt of an EAD, was still "illegally or unlawfully in the United States" for purposes of § 922(g)(5)(A).[4]

_____

[4] We also note 27 C.F.R. § 478.11, promulgated by the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). Section 478.11 defines an "alien illegally or unlawfully in the United States" as an alien who is "not in valid immigrant, nonimmigrant, or parole status," including any alien "who unlawfully entered the United States without inspection and authorization by an immigration officer and who has not been paroled into the United States . . ." Like other courts, we are reluctant to give great deference to this construction, in part because immigration is not the ATF's area of expertise and in part because the degree of deference owed to constructions of criminal statutes is uncertain. See Orellana, 405 F.3d at 369; Atandi, 376 F.3d at 1189. However, we have noted that § 478.11 "is both reasonable and consistent with our interpretive norms for criminal statutes," and is thus owed "some deference." Id. (quoting NLRB v. Okla. Fixture Co., 332 F.3d 1284, 1286-87 (10th Cir. 2003) (en banc)). As Defendant undisputedly entered the United States without inspection or authorization and has not been paroled into the United States, the ATF regulation further supports our conclusion that Defendant is "illegally or unlawfully in the

(continued...)

14

III.

Defendant also argues that § 922(g)(5)(A) is unconstitutionally vague as applied to the facts of his case because "the language of the statute . . . in combination with the ambiguous status of an alien who has applied for adjustment in status, [did] not adequately give notice to [Defendant] that he was committing a crime." Aplt. Br. at 12. In order for Defendant to argue this theory on appeal, he must not have waived it by pleading guilty. United States v. Anderson, 374 F.3d 955, 957 (10th Cir. 2004) (citing Fed. R. Crim. P. 11(a)(2)).

> This analysis calls for the court of appeals, in reviewing appeals brought after a defendant has entered into an appeal waiver, to determine: (1) whether the disputed appeal falls within the scope of the waiver of appellate rights; (2) whether the defendant knowingly and voluntarily waived his appeal rights; and (3) whether enforcing the waiver would result in a miscarriage of justice . . .

Id. (quoting United States v. Hahn, 359 F.3d 1315, 1325 (10th Cir. 2004)).

When considering whether an appeal falls within the scope of a waiver of appellate rights, the general rule is that any appellate rights not expressly reserved in the plea agreement are waived. See id. at 957-58. The question here, then, is whether the reservation of appellate rights in Defendant's plea agreement extends to the argument that § 922(g)(5)(A) is unconstitutionally vague as applied to this case. It plainly does not. In his plea agreement, Defendant reserved only the

---

⁴(...continued)
United States" within the meaning of § 922(g)(5)(A).

right to appeal the district court's denial of his motion to dismiss. A reservation of the right to appeal a specific pretrial ruling by the district court extends only to theories raised in the challenged ruling. Id. at 958. The only argument Defendant made to the district court in his motion to dismiss was that he was not illegally or unlawfully in this country.

In his reply brief, Defendant contends that he did raise the vagueness issue in his motion because he argued that the rule of lenity should inform the district court's construction of § 922(g)(5)(A). Because the rule of lenity and the void-for-vagueness doctrine are "related manifestations of the fair warning requirement," United States v. Lanier, 520 U.S. 259, 266 (1997), Defendant argues that raising one is the equivalent of raising the other, and that the district court addressed vagueness in finding that the rule of lenity should not apply. This argument misstates the relationship between the two. While lenity and void-for-vagueness arguments are clearly related, whether the rule of lenity should apply in construing a statute is a pure question of law. As-applied vagueness challenges involve a factual dimension in that vagueness is determined "in light of the facts of the case at hand." United States v. Bennett, 329 F.3d 769, 777 (10th Cir. 2003). Even if the district court, in addressing Defendant's rule of lenity argument, addressed the legal dimension of vagueness, it did not have the opportunity to address the factual dimension—an area which is uniquely within the purview of the district court. Thus, Defendant's void-for-vagueness theory falls within the

16

scope of his waiver of appellate rights under the first prong of <u>Hahn</u>.

As regards the second and third prongs of <u>Hahn</u>, the defendant has the burden of showing that he did not knowingly and voluntarily waive his appellate rights, or that enforcing the waiver would result in a miscarriage of justice. <u>Id.</u> at 958-59. Defendant has not carried his burden in either regard. He has offered no argument whatsoever on these points, and there is nothing in the record from which this court could conclude that Defendant's waiver was not informed and voluntary, or that a miscarriage of justice would result were the waiver enforced. We conclude that Defendant, in pleading guilty, waived his right to raise his as-applied vagueness argument on appeal.

IV.

The judgment of the district court denying Defendant's motion to dismiss the indictment is AFFIRMED.